James A. BORBELY, et al., Plaintiffs,

v.

NATIONWIDE MUTUAL INSURANCE CO., et al., Defendants.

Civ. No. 78–1872.

United States District Court, D. New Jersey.

Sept. 18, 1981.

Morris Brown, Steven J. Tripp, Wilentz, Goldman & Spitzer, Woodbridge, N. J., for plaintiffs.

Eugene M. Haring, Ronald J. Hedges, McCarter & English, Newark, N. J., for defendants.

## OPINION

ANNE E. THOMPSON, District Judge.

Plaintiffs, 18 former agents[1] of four Nationwide insurance companies[2] [hereinafter "Nationwide" or "defendant"], brought suit against Nationwide to recover damages for the alleged wrongful termination of the Agent's Agreements under which plaintiffs represented defendant in New Jersey. In particular, plaintiffs charged Nationwide with terminating the contracts without cause, without reasonable notice, and in violation of the public policy of New Jersey and of the implied covenant of good faith and fair dealing. In addition, plaintiffs claimed defendant had tortiously interfered with their prospective economic advantage. In a counterclaim, Nationwide charged ten[3] of the plaintiffs with breach of contract, inasmuch as each of the ten had executed an Agreement and Release which allegedly barred them from bringing suit against Nationwide.

The case was bifurcated, and the matter of liability was tried to a jury over 17 trial days from June 2 to June 30, 1981. On the latter date, the jury returned verdicts in favor of plaintiffs on five issues which had been submitted for its consideration.

Nationwide now moves for judgment notwithstanding the verdict pursuant to *Fed.R. Civ.P.* 50(b), for a new trial on defendants' counterclaim under *Fed.R.Civ.P.* 59(a), and for the conditional grant of a new trial pursuant to *Fed.R.Civ.P.* 50(c). In the alternative, defendant seeks a new trial on all issues. The Court, having read and considered the briefs submitted, the authorities cited therein, the evidence at trial, and the oral arguments of counsel at a hearing on July 20, 1981, renders the following opinion.

## I. BACKGROUND FACTS

Although the facts relevant to each of the individual issues raised by defendant on these motions will be set forth in detail at

---

1. Eight of the original 26 plaintiffs either withdrew or were dismissed from the suit prior to trial. The remaining plaintiffs are: James A. Borbely; Robert Maneely; Ralph Mangione; Joseph A. Donofrio; Thomas P. Gardner; Robert P. Werner; Michael Pomarlen; William J. Stiehl; David B. Collins; Joseph Dargan; Victor Major; Anthony T. Galasso; Edward Lubowicki; Michael James Fantozzi; Morris Winograd; Edward G. Robinson; William T. Peters; and Kathleen Hilla, Executrix of the Estate of Donald P. Hilla.

2. These companies are: Nationwide Mutual Insurance Co.; Nationwide Mutual Fire Insurance Co.; Nationwide General Insurance Co.; and Nationwide Life Insurance Co. All have a common management and a common marketing policy.

3. The ten who executed the Agreement and Release are: David Collins; Joseph Dargan; Anthony Galasso; Thomas Gardner; Victor Major; Robert Maneely; Ralph Mangione; Edwin Robinson; William Stiehl; and Robert Werner.

later points in this opinion, a recitation of certain preliminary, uncontroverted facts will provide some necessary context.

In September 1952, Nationwide[4] was authorized to sell various types of insurance in the State of New Jersey, including automobile, casualty, and fire policies. This insurance was marketed through individuals who had executed agency contracts with Nationwide under which the individuals were to represent Nationwide exclusively.[5] Defendant's District Sales Managers were responsible for, among other things, recruiting, training, and supervising these agents. Each of the plaintiffs became a Nationwide agent sometime during the period from 1953 to 1972 by signing whichever Master or Standard Agent's Agreement was then in effect.

All billing and collection of premiums on the policies written by the agents, as well as policy renewals, was done directly between Nationwide and the policyholders. The agents serviced the policies by, among other things, forwarding claims against policyholders to defendant, remitting premiums if paid directly to the agents, and giving advice to policyholders when requested.

From time to time, the agreements between plaintiffs and Nationwide were revised, and the agents asked to execute the revised version. In 1969, Nationwide published a Compensation and Security Handbook [CASH Book], which was distributed to the then-existing agents sometime in the same year, concurrent with a revised Agent's Agreement.

Over the years up to and including 1977, Nationwide developed a series of promotional programs directed at the agents. These included a variety of sales contests and the establishment of clubs representing different levels of achievement in sales production.

In October 1975, Nationwide adopted a plan called the "New Jersey Marketing Strategy" under which, among other things, business, life and health insurance lines were emphasized, quotas were placed on automobile insurance, and a moratorium was imposed on agent recruitment. This plan had been developed as a result of the issuance in 1975 of a Review Team study concerning Nationwide's New Jersey operations. Further studies were conducted between 1975 and 1977, culminating in a decision to withdraw from New Jersey. None of the agents were informed of the results of these studies. Finally, on or about October 13, 1977, Nationwide announced its decision to withdraw from the New Jersey insurance market and informed the agents that their agencies would be terminated effective September 30, 1978. This notice was given orally by Nationwide representatives at an agents' meeting and by form letter given or mailed individually to each agent.[6] Also, on October 13, 1977 Nationwide informed its policyholders that it would not renew commercial fire and casualty policies.

In addition to informing them of the terminations, the notice to agents provided in part for payment of certain benefits,[7] waiv-

4. Until 1954 or 1955, these insurance companies were incorporated under the name "Farm Bureau."

5. The agents were permitted to broker insurance, that is, to place with other insurance companies any business which Nationwide would not accept, pursuant to letters of authority given to individual agents. In addition, the agents could sell through the Automobile Insurance Plan (Assigned Risk).

6. A similar notice was sent to the Commissioner of Insurance for the State of New Jersey.

7. The benefits to be paid on termination were:

A. Deferred Compensation Incentive Credits (for agents with over five years of service).
1. Agents cancelled in 1977—benefits will be those accumulated as of 12/31/76 as provided by the Agent Agreement.
2. Agents cancelled in 1978—benefits will be those accumulated as of 12/31/77 with 1977 benefits computed based on actual earnings through October 1977 and projected through December 1977.
B. Extended Earnings (for agents with over five years of service).
1. Regardless of the Agent Agreement cancellation date, extended earnings will be paid based on the last 12 months renewal service fees prior to 11/1/77.

er of the agreement's non-competition clause after cancellation, and enforcement of the exclusivity provision until termination. The notice also gave instructions concerning the companies' plan for curtailing and ultimately ceasing their insurance sales operation in New Jersey, as it affected the various lines.

Until April 7, 1981, Nationwide maintained its license to sell insurance in New Jersey.[8] As a consequence of litigation in the state court,[9] brought by the Commissioner of Insurance, Nationwide was free to terminate its fire and casualty business in New Jersey except for the renewals required under N.J.S.A. 17:22–6.14a[10] and 39:6A–3.[11] Defendant continues to issue, outside of New Jersey, insurance to its national accounts which conduct activity here.

## II. JUDGMENT NOTWITHSTANDING THE VERDICT

Since Nationwide moved for a directed verdict, both after plaintiffs' case and after the close of all the evidence, and now moves for judgment notwithstanding the verdict on grounds previously advanced on both of those occasions, it may properly seek relief under *Fed.R.Civ.P.* 50(b). *Universal Computer Systems, Inc. v. Medical Services Association of Pa.,* 474 F.Supp. 472, 475 (M.D.Pa.1979), modified on other grounds, 628 F.2d 820 (3rd Cir. 1980). The standards governing a motion for directed verdict under subdivision (a) of Rule 50 and a motion for judgment notwithstanding the verdict under subdivision (b) of the rule are identical. *Fireman's Fund Insurance Co. v. Videfreeze Corp.,* 540 F.2d 1171, 1177 n.5 (3rd Cir. 1976), *cert. denied* 429 U.S. 1053, 97 S.Ct. 767, 50 L.Ed.2d 770 (1977). "The standards to be applied [do, however,] vary according to whether the movant has the burden of proof." *Id.* at 1177.

Where, as here, the movant did not bear that burden at trial, the test is whether, viewing the evidence in the strongest light favorable to the non-moving party and giving him the advantage of every fair and reasonable inference drawn therefrom, the non-moving party has adduced sufficient evidence to create a jury issue. *Id.* at 1177–78. Put another way, the question turns on "whether as a matter of law the record is critically deficient of that minimum quantum of evidence from which a jury might afford relief." *Universal Computer Systems, Inc. v. Medical Services Association of Pa., supra* at 475. On this review neither the credibility of the evidence nor the weight of it may be considered. *Fireman's Fund Insurance Co. v. Videfreeze Corp., supra* at 1178.

Having established the standard by which defendant's application must be adjudged, I

---

Defendant's Exhibit 9. All of the plaintiffs had over five years of service.

**8.** Nationwide Mutual Insurance Company turned in its license on that date.

**9.** *See Sheeran v. Nationwide Mutual Insurance Co., Inc.,* 80 N.J. 548, 404 A.2d 625 (1979).

**10.** The relevant portion of N.J.S.A. 17:22–6.14a in effect at the time of litigation provided:

Termination of any such contract for any reason other than one excluded herein shall become effective after not less than 90 days' notice in writing given by the company to the agent and the Commissioner of Insurance. No new business nor increase in liability on renewal or in force business shall be written by the agent for the company after notice of termination without written approval of the company. However, during the term of the agency contract, including the said 90-day period, the company shall not refuse to renew such business from the agent as would be in accordance with said company's current underwriting standards. The company shall during a period of 9 months from the effective date of such termination, upon request in writing of the terminated agent, renew all contracts of insurance for such agent for said company as may be in accordance with said company's then current underwriting standards and pay to the terminated agent a commission in accordance with the previous agency contract of the terminated agent . . .

Nationwide agreed to comply with the Commissioner's interpretation of this provision.

**11.** In addition to establishing compulsory automobile insurance coverage, and the limits therefor, N.J.S.A. 39:6A–3 provides: "No licensed insurance carrier shall refuse to renew the required coverage stipulated by this act without the consent of the Commissioner of Insurance."

turn now to consider the separate issues which Nationwide raises.

### A. BREACH OF CONTRACT.

The first issue submitted to the jury involved the alleged breach of contract, specifically breach of the agreement's cancellation provision. At the time Nationwide terminated the agency agreements, the clause governing such action provided as follows:

> 9. Cancellation. This Agreement shall continue from its effective date until the end of the current year and shall be automatically renewed thereafter from year to year unless sooner cancelled. This Agreement shall automatically cancel upon the date your license to act as an agent for the Companies is revoked or cancelled, or upon your death, or normal retirement at age sixty-five (65). Further, due to the personal nature of our relationship you or the Companies have the right to cancel this Agreement at any time after written notice has been delivered to the other or mailed to the other's last known address. It is understood that the Agent shall have access to the Agents Administration Review Board, and its procedures, as it may exist from time to time.

Plaintiffs' Exhibit 1(i).

Nationwide has consistently urged that, because the clause is unambiguous, construction of the provision is a matter for the court rather than the jury, and further, that the only possible construction is that the contract was terminable at will by either party, with or without cause. In addition, Nationwide claims that existence of the implied condition that defendant would continue to do business in this state and would continue to have business to give plaintiffs is also a matter of law for the court to decide. Finally, defendant takes the position that, inasmuch as no evidence was adduced upon which reasonable persons could differ, the issues of the existence of "cause" to terminate the Agent's Agreement and of the adequacy of notice are not subject to jury determination.

Plaintiffs contend the quoted passage is ambiguous and, when viewed in light of extrinsic evidence, is susceptible of an interpretation that cause, namely agent misconduct, is required before an agent may be properly terminated, which construction would be the function of the jury.

■ "Ordinarily the construction of a written agreement is a matter for the court, but where its meaning is uncertain or ambiguous and depends upon parol evidence admitted in aid of interpretation, the meaning of the doubtful provisions should be left to the jury." *Michaels v. Brookchester, Inc.,* 26 N.J. 379, 387, 140 A.2d 199 (1958) (citations omitted).[12] Thus it falls to the court, in the first instance, to decide whether the provision under scrutiny is or is not ambiguous. *See Gray v. Joseph J. Brunetti Construction Co.,* 266 F.2d 809 (3rd Cir.), *cert. denied,* 361 U.S. 826, 80 S.Ct. 74, 4 L.Ed.2d 69 (1959). In making this determination, the court should consider the circumstances surrounding the making of the agreement, since "debatability of meaning is not always discernible at the first reading of a contract by a new mind [; m]ore often it becomes manifest upon exposure of the specific disputed interpretations in the light of the attendant circumstances." *Garden State Plaza Corp. v. S.S. Kresge Co.,* 78 N.J.Super. 485, 496, 189 A.2d 448 (App. Div.), *cert. denied,* 40 N.J. 226, 191 A.2d 63 (1963). *Accord, Sherman v. Mutual Benefit Life Insurance Co.,* 633 F.2d 782 (9th Cir. 1980).

Over the course of years, dating from the time Nationwide was first authorized to sell

---

12. It is well settled that a federal court sitting in a diversity action must follow the conflict of laws rules of the forum state in determining what substantive law shall apply. *Klaxon Co. v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). In this state, it is the general rule that the validity and interpretation of a contract is governed by the law of the place of contracting, except in certain situations not applicable here. *Doyle v. Northrop Corp.,* 455 F.Supp. 1318 (D.N.J.1978). The parties and the Court are in agreement that New Jersey law shall govern this action.

insurance in New Jersey, defendant utilized at least four versions of termination clause. Depending on the date upon which an individual plaintiff became an agent by signing the form of agreement then in effect, one of the following applied. As noted above, as the agreement was revised, each existing agent signed the revised version.

The 1953 Farm Bureau agreement provided, in relevant part:

4. It is mutually agreed and understood:

(a) That this agreement shall take effect upon the date hereof and shall continue until the end of the current license year and shall be automatically renewed thereafter from year to year unless sooner terminated.

This agreement shall automatically terminate upon the date the Agent's license to act as Agent for the Companies is revoked or cancelled or upon the date of death of the Agent, or this agreement may be terminated, with or without cause, by either party by giving written notice to the other and shall be deemed terminated as of the date specified in such notice. Upon termination, the Agent shall be entitled to receive only such compensation as shall be due the Agent as provided for in said schedules and in accordance with all of the conditions relating thereto.

Plaintiffs' Exhibit 1(j).

From 1954 until 1969, the termination clause stated:

4. It is mutually agreed and understood:

(a) That this Agreement shall take effect upon the date hereof and shall continue until the end of the current license year and shall be automatically renewed thereafter from year to year unless sooner terminated.

This Agreement shall automatically terminate upon the date the Agent's license to act as an Agent for the Companies is revoked or cancelled or upon the death of the Agent, or this Agreement may be terminated by either party by giving written notice to the other and shall be deemed terminated as of the date specified in such notice. Upon termination, the Agent shall be entitled to receive only such compensation as shall be then due the Agent as provided for in this Agreement including the said Schedules and in accordance with all of the conditions relating thereto.

Plaintiffs' Exhibit 1(a).

In 1969 the provision was again revised, and from July 1st of that year until 1976, the clause stated:

9. Termination. This Agreement shall continue from its effective date until the end of the current year and shall be automatically renewed thereafter from year to year unless sooner terminated.

This Agreement shall automatically terminate upon the date your license to act as an Agent for the Companies is revoked or cancelled, or upon your death, or normal retirement at age sixty-five (65). Further, due to the personal nature of our relationship you or the Companies have the right to terminate this Agreement at any time after written notice has been delivered to the other or mailed to the other's last known address.

Plaintiffs' Exhibit 1(h).

Finally, effective January 1, 1977, the operative Agent's Agreement was revised, and the cancellation clause quoted at the beginning of this section came into effect.

At trial, each plaintiff testified concerning representations made to him by Nationwide employees, usually the local District Sales Managers ["DSM's"], and officials, at the time he was recruited as an agent and during the course of his agency relationship with defendant.[13] In general, the represen-

---

**13.** Appendix A contains a summary of each plaintiff's testimony with respect to this issue. Since each plaintiff signed successive contracts with Nationwide, statements during the course of the agency relationship were relied upon by plaintiffs as extrinsic evidence of the interpre-

tation to be accorded not only to the contract in effect at the time the statements were made but also as to the succeeding contract.

Kathleen Hilla, Donald Hilla's widow, did not testify as to statements made either to her or to her husband by Nationwide employees.

tations involved assurances of lifetime security and the opportunity to build one's own business and eventually to pass it on to a family member, financial security, and the companies' desire to retain agents until retirement. With respect to termination, Nationwide employees essentially assured plaintiffs that the companies did not invoke the cancellation provision unless an agent performed or produced poorly despite assistance, failed to fulfill obligations to Nationwide or its policyholders, or was dishonest.

Plaintiffs also rely on certain documentary evidence, in particular the CASH Book, the Challenger newspapers, and the minutes of Agents' Advisory Council meetings.

The CASH Book contained the following passage regarding termination:

The Company can be expected to exercise its right to cancel the agreement under the following conditions:

—Breach of contract, criminal acts, dishonesty or fraud by the agent.

—Agent actions that are clearly contrary to the best interests of the customer and the Company, which include failure of the agent to:

—promptly submit money or applications,

—furnish complete and accurate information on applications,

—adhere to underwriting and administrative rules, or,

—deliver acceptable service to customers.

Plaintiffs' Exhibit 1(c).

The MERO Regional Advisory Board minutes of March 24–26, 1975, records a statement by defendant's Regional Personnel Manager, Mr. Fietkiewicz, to the effect that an agent should not have to fear for his security and that the information in the CASH Book was "contract." Plaintiffs' Exhibit 56. In a similar vein, the minutes of a February 12, 1976, meeting of the New Jersey Sales Region Agent Advisory Council contain statements by Alex Gonzales,

New Jersey Regional Sales Manager, concerning no instance of arbitrary termination during his many years with Nationwide and the need for good faith on the part of both companies and agents. Plaintiffs' Exhibit 57.

The copies of the Challenger newspapers admitted into evidence contained articles dealing with agents' children and spouses joining and, in some instances, taking over, the agents' businesses. Plaintiffs' Exhibits 40 through and including 55. These articles, plaintiffs contend, support the personal assurances they received about passing on their businesses at retirement.

Defendant's evidence as to attendant circumstances [14] consisted of five basic elements: additional CASH Book language; testimony about moratoria on automobile policies and effects of the New Jersey marketing strategy; successive contract signings; testimony as to the companies' understanding of the termination clause; and testimony elicited from plaintiffs regarding agent concern over their termination rights. This proof purports to demonstrate the parties' true understanding of their termination rights.

With reference to the CASH Book, defendant cites the Court to paragraphs immediately preceding and following the above-quoted passage, which paragraphs place that excerpt in proper context. This additional language provides:

It is recognized, however, that there are circumstances under which either you or the Companies may initiate action for cancellation of your contract. If the Companies initiate the action, it is the general policy to notify you that cancellation is being considered and that your Agreement may be cancelled at a specific date after such notification.

Company initiated cancellation of an independent contractor agent's agreement will require prior approval of the Vice-President-Regional Manager or Vice-

---

**14.** The Court may properly consider proof offered by defendant with respect to attendant circumstances when making its determination as to whether the contract is ambiguous. *See Gray v. Joseph J. Brunetti Construction Co., supra.*

President-Business Accounts. To further insure consistency and uniform treatment, such cancellations will also be reviewed in the Office of Marketing on an on-going basis.

The Independent Contractor Agent's Agreement gives either party—the Company as well as the agent—the right to cancel the agreement at any time, for any reason, with or without cause.

 \* \* \* \* \* \*

Company initiated cancellation of an Independent Contractor agent agreement for reasons other than the above are expected to be rare.

Plaintiffs' Exhibit 2(c).

With regard to moratoria on automobile policies, plaintiffs testified on cross-examination that during the 1970's Nationwide from time to time imposed limits on the number of new policies, or "green business," they could write, as well as on the number of second-car additions to existing policies because of that line's unprofitability. Similarly, plaintiffs testified that in 1975, when Nationwide's New Jersey Marketing Strategy plan was put into effect, they were given a choice of three options:

1. To remain as a personal lines agent,

2. To become exclusively a commercial lines agent, or

3. To terminate their agencies for Nationwide.

Also on cross-examination, plaintiffs testified that they signed the revised contracts as they were presented and without having negotiated the terms contained therein. This latter testimony, defendant contends, lends support to its claim that the meaning of the termination provision remained essentially the same from 1953 until 1977, despite some minor changes in language.

As part of defendant's case, its Vice-President of Field Operations, Robert H. Ourant, testified about the companies' understanding of the cancellation clause, stating that, notwithstanding amendments to the language of the clause over the years, this provision has always given either party the unconditional right to terminate the agreement at will, with or without cause.[15] According to this witness, the sentence added in the 1977 agreement concerning access to the Agents Administration Review Board was designed to prevent arbitrary terminations, presumably by an agent's immediate superior.

The agent's concern over their vulnerability to termination was demonstrated, defendant claims, by the minutes of the advisory board and advisory council meetings to which reference was made above and by testimony elicited from certain plaintiffs about these minutes. In addition, defendant cites the Court to Mr. Winograd's testimony regarding a Regional Roundtable meeting in the mid-1960's, at which agents complained that the contract in existence at that time "still does not show that the agents could be cancelled only for cause …" T.1726:7–8. Plaintiffs were also asked on cross-examination whether they had attended a 1975 New Jersey Forum Executive Committee (agents') meeting at the Playboy Club, at which an attorney rendered an opinion that 1969–1976 agreement provided for termination at will.[16]

Having set forth the evidence of attendant facts and circumstances, I must now determine in light of this evidence whether the cancellation clause of the 1977 agreement is ambiguous and reasonably susceptible of the interpretation which plaintiffs urge, thus raising an issue of fact for the jury, or whether, as defendant asserts, the clause is clear and unambiguous, making its

---

**15.** In answer to a question about the change in language from "with or without cause" to omission of the phrase, and his understanding of the companies' intention in deleting it, Mr. Ourant stated: "Not to my understanding. I really don't think we changed anything. We really went from 'with or without cause' to 'cancel at any time.' The unconditional agreement was always there, that either party could

cancel the contract. I don't believe it was changed." T.2332:12–17.

**16.** Plaintiffs Donofrio, Werner, Pomarlen, Lubowicki, Winograd, Robinson, and Peters testified they had attended this meeting, along with approximately 30 other agents from New Jersey.

construction an issue for the Court. I begin, of course, with the language of the provision, in particular the last two sentences, which provide:

> Further, due to the personal nature of our relationship you or the Companies have the right to cancel this Agreement at any time after written notice has been delivered to the other or mailed to the other's last known address. It is understood that the Agent shall have access to the Agents Administration Review Board, and its procedures, as it may exist from time to time.

■■ At the outset, it is manifest that this language cannot be construed to entitle plaintiffs to lifetime agencies despite verbal assurances to that effect antecedent to the execution of the operative agreement.[17] Agreements for lifetime employment are enforced with marked reluctance by the courts, and then only when the commitment has been "clearly, specifically and definitely expressed."[18] *Savarese v. Pyrene Manu-* *facturing Co.,* 9 N.J. 595, 601, 89 A.2d 237 (1952). At best, the representations by Nationwide employees with respect to lifetime tenure amount to "friendly assurance[s]," *id.* at 603, 89 A.2d 237; they are patently insufficient under the law to create an obligation in defendant to retain plaintiffs until death or retirement.

■ Furthermore, this evidence upon which plaintiffs rely to create an issue of fact for the jury fails for similar reasons to demonstrate that the agents could be terminated solely for their own misconduct. Statements of assurance by Nationwide employees and officials, that agents were never arbitrarily terminated or were never terminated without adequate cause on the part of the agent, are in the nature of expressions of expectation about Nationwide's behavior. These representations are inadequate evidence of defendant's understanding of the termination clause; rather, they describe either Nationwide's usual practice or its perception of how it ought to

---

**17.** For present purposes, I am assuming these statements are admissible under *Fed.R.Evid.* 801(d)(2)(D) under the theory of apparent authority. I am not convinced, however, that plaintiffs have adduced that minimum quantum of evidence necessary to invoke the doctrine and justify submission of the question to the jury. As stated in *J. Wiss & Sons Co. v. H. G. Vogel Co.,*

> The question in every such case is whether the principal has by his voluntary act placed the agent in such a situation that a person of ordinary prudence, conversant with business usages, and the nature of the particular business, is justified in presuming that such agent has authority to perform the particular act in question, and when the party relying upon such apparent authority presents evidence which would justify a finding in his favor, he is entitled to have the question submitted to the jury.

86 N.J.L. 618, 621, 92 A. 360 (E. & A. 1914). Given the inclusion in each successive Agents Agreement of a clause barring amendments and modifications unless embodied in a writing signed by the agent and an officer of the companies, a person of ordinary prudence could not reasonably presume the DSMs had authority to alter verbally the terms of the agreement. *See* Plaintiffs' Exhibit 1(i) ¶ 17. Moreover, there was testimony that the DSMs could not irrevocably commit the defendant to hire a particular agent, since approval of the Regional Sales Manager was required.

**18.** Justice Wachenfeld went on to summarize the practical reasons for this judicial skepticism as follows:

> Because of the unusual nature of the agreement, the length and permanence of the obligation undertaken, the various unforeseeable events and conditions which may be encountered in such a journey *in futuro* and the unpredictable effects upon the parties, special precautions have been decreed essential both as to consideration and enforcing the compact. The responsibilities assumed and the obligations imposed will be neither created nor spelled out by mere inference when they are not clearly and unequivocally expressed in the contract itself.

*Savarese v. Pyrene Manufacturing Co.,* 9 N.J. at 603, 89 A.2d 237.

Although contracts for permanent employment and employment contracts terminable only for cause are often treated as one and the same obligation, *see id.,* I have accorded them different treatment for purposes of this matter. The distinction I discern here is that "cause" may be cause on the part of the agent, such as dishonesty or inadequate performance, or cause on Nationwide's part, such as business necessity. In *Savarese,* the court treated contracts for permanent employment and contracts terminable only for cause given by the employee as identical in nature.

deal with its agents. *Corenswet, Inc. v. Amana Refrigeration, Inc.,* 594 F.2d 129, 136 (5th Cir.), *cert. denied,* 444 U.S. 938, 100 S.Ct. 288, 62 L.Ed.2d 198 (1979). Likewise, the CASH Book language, the articles in Nationwide's newspapers, and the minutes of agents' meetings may have raised in plaintiffs an expectation as to defendant's likely future conduct and good intentions towards its agents, but they do not constitute evidence of Nationwide's understanding or intent when viewed in light of the actual language of the cancellation clause.

All of the proof pertaining to the parties' understanding of the termination provision points unequivocally to an interpretation which is apparent from the contract on its face. Over the years, and despite the assurances they received, the agents expressed to Nationwide their concern that the companies might terminate an agent notwithstanding his good production and faithful fulfillment of his contractual duties. Nevertheless, the clause remained essentially unchanged and plaintiffs voluntarily signed each revised agreement as it was presented, even though Nationwide expressly declined to make the requested changes in the clause. Given the evidence presented on this issue, it is abundantly clear that the parties, each of them, knew precisely what the provision meant. The fact that plaintiffs were unhappy with Nationwide's reservation of a right to cancel their agreements without cause cannot affect the plain meaning of the clause. In addition, the CASH Book section on cancellation, when read in its entirety, plainly states that termination may be effected at the will of either party to the Agreement while at the same time providing the agents with a list of situations in which cancellation is quite likely to occur.

I find, first, that the Agent's Agreement was intended by the parties to be the full expression of their bargain. *See Atlantic Northern Airlines, Inc. v. Schwimmer,* 12 N.J. 293, 96 A.2d 652 (1953). Although the CASH Book was sometimes discussed in terms of "contract" or "Bible," the Agent's Agreement itself (which was physically placed in the first divider of the CASH Book) embodied the terms of the contract between Nationwide and the agent; the Agent's Agreement was the only document requiring signatures of both parties.[19]

■ I conclude finally, that the disputed clause is clear and unambiguous and, therefore, that its construction is a matter for the Court to decide. The plain language of the clause provides that either the agent or Nationwide could terminate the contract at any time either chose by properly notifying the other of the intention to do so. The final sentence of the section, added at the time of the last revision, merely gave the individual agent an opportunity to appeal an apparently arbitrary termination; it did not operate to require cause for termination.

■ Having found that the agreement is integrated and that in unambiguous terms it provides for cancellation at will by either party, I must also conclude that the evidence offered by plaintiffs as to representations of lifetime security and termination only for cause is barred by the parol evidence rule. "The parol evidence rule applies ... to prevent the substantive alteration of contractual terms agreed upon by the parties and expressed in an integration of their bargain, by resort to other prior or contemporaneous agreements or understandings." *Garden State Plaza Corp. v. S.S. Kresge Co., supra* 78 N.J.Super. at 496, 189 A.2d 448.

■ Even assuming that the Agent's Agreements were terminable only for cause, I am convinced that Nationwide's continued presence in the New Jersey insurance market served through these plaintiffs was an implied condition upon which the agreements were premised.

---

**19.** There was testimony showing that the companies issued new pages of the CASH Book periodically, which the agents were instructed to insert in place of superseded material. In essence, the CASH Book was the agent's handbook, a ready reference for current information on the companies' benefits for agents and corporate marketing policies.

When the parties have reached an agreement otherwise sufficient to constitute a contract but have had no communication regarding a matter as to which their legal rights must be determined, the missing element may be supplied either by proof of an implied-in-fact understanding between them or by operation of a rule of law.

*McKinney v. National Dairy Council,* 491 F.Supp. 1108, 1110–11 (D.Mass.1980). As a matter of law, once Nationwide made its decision to withdraw from the New Jersey market and to cease selling in this State those lines of insurance which had previously been marketed through independent contractor-agents, and acted thereon,[20] the parties' obligations under the contracts ended. *Id. See Savarese v. Pyrene Manufacturing Co., supra,* 9 N.J. at 603, 89 A.2d 237, *citing* 35 *Am.Jur.* 460, Sec. 24. Indeed, once defendant ceased its activities in New Jersey, the objects of both parties which the contract was designed to fulfill, no longer existed. Plaintiffs would be unable to sell Nationwide lines and to earn a living doing so, and defendant would no longer market its lines to New Jersey consumers.

 Maintaining for the present, the assumption that the contract required cause for termination, for purposes of deciding whether plaintiffs adduced sufficient evidence to overcome the *bona fides* of defendant's business decision to withdraw from New Jersey, I conclude that no jury issue was created in this respect. Once Nationwide introduced evidence as to the persistent losses suffered in New Jersey, the studies undertaken to determine the extent of those losses and possible remedial measures, and, ultimately, the companies' decision to cease business here, it established good cause for termination. *See Helsby v. St. Paul Hospital and Casualty Co.,* 195 F.Supp.

385 (D.Minn.1961), *aff'd per curiam* 304 F.2d 758 (8th Cir. 1962); *Quick v. Southern Churchman Co.,* 171 Va. 403, 199 S.E. 489 (1938). Plaintiffs produced no evidence to show, or from which a jury could fairly and reasonably infer, that defendant failed to act in a reasonably prudent manner, and in good faith when it terminated the agreements on this ground. As a matter of law, then, defendant had cause to end the agency relationships.

Finally, I reach the issue of adequacy of notice. Each plaintiff testified to having learned of the terminations on or about October 13, 1977, either at an agents' meeting on that date or from another source. Also on that date, defendant's Vice-President-Regional Manager, D.E. Clauson, mailed or caused to be delivered to each plaintiff a written notice of the companies' action and its effective date, September 30, 1978, as required under the contract.[21] At a minimum, then, plaintiffs received notice fully 11 months prior to the actual date of cancellation.

 I find that notice was, without question, adequate under the circumstances for two reasons. First, the regulatory scheme governing the conduct of insurance business in New Jersey includes a provision requiring that termination of an agency contract, except for specifically enumerated reasons, be effective only after 90 days have expired from the date written notice was given by the company to the agent and to the Commissioner of Insurance. N.J.S.A. 17:22–6.14a. Assuming, without deciding, that the agency termination provisions of the statute do not apply to these particular contracts because plaintiffs had agreed to represent Nationwide exclusively, *see id.,* I find the statute nevertheless probative of the amount of time which can be considered

---

**20.** No testimony was adduced that defendant continued to do business in the State other than to service national accounts, that is, policies sold outside of New Jersey to entities doing business in a number of states, and to service the existing policies as required by the agreement between Nationwide and the Commissioner of Insurance and by the decision in

*Sheeran v. Nationwide Mutual Insurance Co., Inc., supra.*

**21.** Subsequently, on June 12, 1978, a second notification letter was mailed to the individual agents, informing them of the cancellation of their agreements. Not one of the plaintiffs claimed that this was the first notice they received of the proposed action.

reasonable. Plaintiffs were afforded over triple the amount of time required by that statute. Second, and more importantly, plaintiffs produced no testimony bearing on the issue of reasonableness under the circumstances, and from which the jury could determine that the notice given was inadequate. Presumably, reasonable notice would have been necessary to enable an agent to make plans for a substitute livelihood, either a complete change of occupation or, as seems more probable, licensure by other insurance companies, brokerage, and the Automobile Insurance Plan. The testimony which they did offer tended to show, if anything, the ease with which the latter plans could be implemented.[22]

For the foregoing reasons, I am convinced that defendant is entitled to judgment notwithstanding the verdict on the issue of breach of contract.

### B. BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING.[23]

In every contract there is an implied covenant that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract; in other words in every contract there exists an implied covenant of good faith and fair dealing." . . . Where fairness and justice require, even though the parties to a contract have not expressed an intention in specific language, the courts may impose a constructive condition to accomplish such a result when it is apparent that it is necessarily involved in the contractual relationship.

*Palisades Properties, Inc. v. Brunetti,* 44 N.J. 117, 130, 207 A.2d 522 (1965) (citations omitted).

In the instant case, plaintiffs contend defendant breached this implied covenant by terminating them without misconduct on their part, thereby causing them to cease receiving renewal commissions after September 30, 1978, by failing to give adequate notice of the termination, and by terminating them in bad faith. In support of these contentions, they cite a number of New Jersey cases in which the concept is defined and applied to widely disparate circumstances. In each case, one party to an agreement, although not technically in breach of express contractual terms, had committed some unconscionable act which served to deprive the other party of the contemplated fruits of their agreement.

Two of the cases involved collusion with third parties, a circumstance not even arguably present here. In *Palisades Properties, Inc. v. Brunetti, supra,* the Borough of Fort Lee amended a zoning ordinance and vacated two paper streets so as to permit the erection by a developer of buildings to a height in excess of height restrictions on adjacent property covered by an agreement between the Borough and a charitable organization. Finding that the intention of the agreement was to preserve the scenic beauty of the Palisades, unsullied by buildings rising above its summit, the court went on to state, "[a]lthough verbally unex-

---

**22.** Once free of the restraint imposed by Nationwide's continued insistence on enforcement of the Agreement's exclusivity clause during the existence of the agency relationships, plaintiffs were able to obtain licenses from other insurance companies without apparent difficulty.

**23.** Throughout the litigation, plaintiffs sought to rely by analogy on the principle enunciated in *Shell Oil Co. v. Marinello,* 63 N.J. 402, 307 A.2d 598 (1973), to the effect that public policy prohibits an oil company from terminating a franchise and lease held by a service station operator without good cause, which in such circumstances is defined as the operator's failure to comply with the obligations imposed on him by the franchise agreement. I find that case clearly distinguishable inasmuch as it dealt with the area of franchise relationships, a subject of recent legislative concern. *See* N.J. S.A. 56:10–1 *et seq.* Although that case was not governed by the provisions of the Franchise Practices Act because defendant's last renewal antedated its effective date, the opinion makes plain that the same principles controlled. *Westfield Centre Service, Inc. v. Cities Service Oil Company,* 86 N.J. 453, 432 A.2d 48 (1981), recently decided by the New Jersey Supreme Court, explains the requirements of the Franchise Practices Act, a statute not governing the contractual relationships existing here.

pressed, implicit in this agreement was the understanding that neither party by its affirmative act would assist a third party in frustrating the contract in derogation of the benefits sought to be obtained." 44 N.J. at 131, 207 A.2d 522. As a consequence, the charitable organization and a park commission were entitled to declaratory and injunctive relief against the Borough and the third party developer.

Similarly, in *Association Group Life, Inc. v. Catholic War Veterans,* 120 N.J.Super. 85, 293 A.2d 408 (App.Div.1971), *modified per curiam,* 61 N.J. 150, 293 A.2d 382 (1972), an insurer and group policyholder allegedly conspired to eliminate the original broker in order that the policyholder could assume the broker's functions and receive its compensation. To accomplish this and to circumvent the statutory requirements concerning insurance brokers, the insurer arranged for one of its own employees to be recognized as the nominal broker of record. Although the arrangement did not literally violate contract between broker and insurer, the Supreme Court was persuaded that a jury could find a breach of the implied covenant of good faith and fair dealing under the circumstances. 61 N.J. at 153–54, 293 A.2d 382.

By contrast, the two other cases on which plaintiffs rely involved actions taken by one party to an agreement acting alone. Plaintiff in *Bak-A-Lum Corp. v. Alcoa Building Products, Inc.,* 69 N.J. 123, 351 A.2d 349 (1976), was the exclusive distributor in northern New Jersey of defendant manufacturer's products under a verbal agreement. Notwithstanding plaintiff's satisfactory performance, its "exclusive" was effectively terminated when defendant appointed additional distributors, after a year of secret planning during which plaintiff was encouraged to expand its warehouse facilities and, just before announcement of the appointments, was induced to expand greatly its inventory. "In such circumstances defendant's selfish withholding from plaintiff of its intention seriously to impair its distributorship although knowing plaintiff was embarking on an investment substantially predicated upon its continuation con-

stituted a breach of the implied covenant of good faith and fair dealing . . ." *Id.* at 131, 351 A.2d 349. The court, agreeing with the trial judge that the contract was terminable only after a reasonable time and on reasonable notice but disagreeing as to the extent of time, determined that a reasonable time under the circumstances, giving substantial weight to defendant's conduct, was 20 months.

The situation in *Bak-A-Lum* finds no parallel here, despite plaintiffs' contention that Nationwide considered withdrawal for at least a year prior to the announcement to the agents and policyholders in October 1977, during which year Nationwide continued to exhort plaintiffs to sell insurance and to "expand" their businesses. These circumstances simply create no jury issue as to good faith and fair dealing under *Bak-A-Lum.* In that case, the decision to alter the parties' relationship was actually made a substantial period of time before it was acted upon and was actively concealed until the announcement was made. Moreover, plaintiff in *Bak-A-Lum* made a significant financial investment, in the amount of $150,000, and added substantially to its operating expenses, under circumstances " 'bespeak[ing] a certain hypocrisy as well as ruthlessness' " on defendant's part. *Id.* at 128, 351 A.2d 349. No similar facts appear here; there was no evidence of sizeable expenditures or assumption of additional obligations in reliance on the continued existence of plaintiffs' agencies, and no evidence that defendant concealed its decision to withdraw, once made.

Most recently, the implied covenant theory has been applied where residents of a retirement community sought adequate periodic accountings from the community's operator, despite the absence of any such requirement in their agreements. In *Onderdonk v. Presbyterian Homes of New Jersey,* 85 N.J. 171, 425 A.2d 1057 (1981), the court found that, in view of defendant's status as a non-profit corporation, the special relationship of the parties under the "life-care" contracts, the assurances of financial and personal security given to plaintiff residents, and the failure to warn residents that their money might be used to

fund defendant's other activities, it was reasonable to infer that the income from the community be restricted to use for expenses related to maintenance of the community. A necessary corollary to this restriction was the obligation to provide each resident with meaningful financial statements. Such statements were found to be implicitly required by the agreements. *Id.* at 188, 425 A.2d 1057.

In my view, *Onderdonk* entailed a unique set of circumstances and hence offers no guidance here.[24]

The parties essentially agree that commissions paid upon new and renewed insurance policies plaintiffs wrote constitute "fruits" of the contract.[25] From plaintiffs' perspective, however, the renewal commissions comprised their "substantial intended compensation," since these recur over the life of a policyholder's relationship with Nationwide. In addition, although it is arguably less substantial in amount, the Agent's Security Compensation payable upon retirement, death, disability, or "qualified cancellation," *see* Plaintiffs' Exhibit 1(i) ¶ 11, may also be considered fruits accruing to the benefit of an agent upon the happening of one of the enumerated events. As to these latter benefits, plaintiffs do not claim they were not properly paid.

The Agent's Agreement specifically provides that the agent shall be compensated for all services rendered pursuant to the contract solely in accordance with each company's General Conditions and Schedules,[26] incorporated by reference into the agreement. Plaintiffs' Exhibit 1(i) ¶ 7. Further, the General Conditions sheet, at paragraph 6, provides that, "[u]pon cancellation of your Agreement, all compensation provided in these Schedules shall immediately cease . . ." except for certain specified original commissions. Plaintiffs' Exhibit 2(c).

The difficulty with plaintiffs' position with regard to renewal commissions is that the Agent's Agreement itself clearly delineates the circumstances under which an agent is entitled to receive original and renewal commissions—solely during the life of the relationship. Once cancelled, an agent is entitled only to the Agent's Security Compensation. Not one of the cited cases supports the proposition that the implied covenant of good faith and fair dealing may impose a condition in direct contravention of an unequivocal provision in a contract covering the identical subject.

As to the issues of inadequate notice and bad faith, I conclude plaintiffs have failed to adduce that minimum quantum of evidence sufficient to create a question for the jury. With regard to both contentions, the considerations noted above in relation to plaintiffs' breach of contract claim based on the same two issues apply.

Accordingly, defendant is entitled to judgment notwithstanding the verdict on the issue of breach of the implied covenant of good faith and fair dealing.

### C. TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE.

 Termination of the Agent's Agreements and the resultant cessation of

---

24. The court's opinion manifests its special concern for protection of the elderly who entrust their social and economic welfare to operators of life-care communities.

 The intent of the parties in- executing the Residence Agreements must be understood in the context of the social utilitarian purposes of life-care communities, such as Meadow Lakes. These communities provide for most of the special needs of the elderly . . . Homes held *itself* out to prospective residents in precisely that manner. It also assured them of security and peace of mind, perhaps the most vital assurances that an elderly retired person would seek.

 *Id.* at 184, 425 A.2d 1057 (footnote omitted).

25. As a practical matter, after Nationwide's withdrawal from New Jersey and its termination of the agents' contracts, the number of policy renewals would likely shrink, and any renewal service fees which might have been paid to the agents, but for cancellation, would also shrink. *See* Defendant's Exhibit 9 regarding non-renewal of certain lines.

26. The General Conditions and Schedules unilaterally revised from time to time by the companies, contained the lists of rates at which original compensation on new coverages and renewal service fees would be paid for each insurance line.

renewal service fees is also the focus of the next claim advanced by plaintiffs, tortious interference with prospective economic advantage. Generally, this cause of action requires a tripartite situation wherein a third party intentionally and maliciously interferes with a present or prospective relationship between two other parties, from which relationship the complaining party reasonably expected to receive economic benefit or advantage.[27] *See Harris v. Perl,* 41 N.J. 455, 197 A.2d 359 (1964); *Louis Schlesinger Co. v. Rice,* 4 N.J. 169, 72 A.2d 197 (1950); *Sustick v. Slatina,* 48 N.J.Super. 134, 137 A.2d 54 (App.Div.1957); *Restatement (Second) of Torts* §§ 766, 766B. Here, the gravamen of plaintiffs' case is defendant's alleged malicious interference with its own contract with plaintiffs, conduct which I am now convinced is simply not actionable under this theory. *O'Connor v. Harms,* 111 N.J.Super. 22, 266 A.2d 605 (App.Div.), *cert. denied,* 57 N.J. 137, 270 A.2d 40 (1970).

Moreover, even assuming an action for tortious interference might otherwise lie, plaintiffs must show that defendant wrongfully and without justification interfered with plaintiffs' expectancy of economic benefit. In this regard,

> [j]ustification connotes just, lawful excuse; it excludes malice. Malicious interposition is unjustifiable in the legal sense ... [T]he modern English doctrine is that an intent is wrongful if malicious ... And malice may be inferred from the absence of just cause or excuse ... If the challenged action were taken for the indirect purpose of doing injury to appellant, or of benefiting respondents at the former's expense, it is a wrongful act, unless done in the exercise of an equal or superior right, and therefore a malicious act, and actionable.

*Louis Kamm, Inc. v. Flink,* 113 N.J.L. 582, 588–89, 175 A. 62 (E. & A. 1934) (citations omitted).

Having previously decided that the Agent's Agreements were terminable at will by either party, upon proper notification, it follows that defendant had the right to perform the act which gave rise to this lawsuit. "Since defendant had that right, the exercise thereof constituted ample justification for its action and cannot result in imposition of tort liability." *Levin v. Kuhn Loeb & Co.,* 174 N.J.Super. 560, 574, 417 A.2d 79 (App.Div.1980).

> Basic to our free enterprise system is the right to enter or to refrain from entering or continuing a contractual relationship. Rejection of an offer, or termination of a contract in accordance with its express terms, is a right the exercise of which is unencumbered by the threat of tort liability.

*Rothermel v. International Paper Co.,* 163 N.J.Super. 235, 244, 394 A.2d 860 (App.Div. 1978), *cert. denied,* 79 N.J. 487, 401 A.2d 242 (1979).

For these reasons, I conclude that defendant is entitled to judgment notwithstanding the verdict on the question of tortious interference with prospective economic advantage.

---

**27.** Plaintiffs nevertheless argue that this tort claim is properly asserted in these circumstances under *Association Group Life, Inc. v. Catholic War Veterans, supra.* This case is ultimately inapposite.

In the decision in that case at the appellate level, there was extended discussion of defendant Catholic War Veterans' ["CWV"] potential tort liability to plaintiff based on the former's plan "to appropriate for itself [plaintiff's] expectancy in the renewal brokerage commissions" and also to obtain fees on new insurance certificates through apparent subterfuge. *Id.*

120 N.J.Super. at 99, 293 A.2d 408. As I read the Appellate Division opinion, in conjunction with the Supreme Court's *per curiam* modification, *see* 61 N.J. at 154, 293 A.2d 382, it was CWV's interference with the pecuniary benefits which plaintiff expected to receive from its contract with the insurer which gave rise to CWV's liability under this theory. This interpretation finds support in the cases cited in the court's discussion, all of which involved third party interference with the relationship, or prospective relationship, between two other parties.

### D. DURESS AND LACK OF CONSID-ERATION—AGREEMENT AND RE-LEASE.[28]

In its defense of the suit as to ten of the former agents,[29] Nationwide asserted the existence of valid Agreement and Releases executed by these plaintiffs which bar maintenance of the action. In addition, Nationwide counterclaimed against the individuals for breach of contract. The operative provision of the Agreement and Release reads as follows:

> As further consideration, the agent hereby agrees he will never make any demand or claim, commence or prosecute any action at law or in equity; or any proceeding of any description against Nationwide, their affiliates, employees officers or directors in any way growing out of any relationship or contracts with Nationwide or the aforementioned corporations or individuals . . . .

Defendant's Exhibit 18.

■■■ There is no controversy over whether the ten plaintiffs indeed signed the document, or over the effect of its execution, absent some ground for vitiation. In New Jersey, it is the general rule,

> that where a party affixes his signature to a written instrument, such as a release, a conclusive presumption arises that he or

she read, understood and assented to its terms and will not be heard to complain that the effect of the act of signing was not comprehended.

*Van Houten Service, Inc. v. Shell Oil Co.,* 417 F.Supp. 523, 527 (D.N.J.1975), *aff'd mem.* 546 F.2d 421 (3rd Cir. 1976). A covenant not to sue may be pled in bar, and a breach thereof may constitute grounds for an action for damages. *Line & Nelson v. Nelson & Smalley,* 38 N.J.L. 358 (Sup.Ct. 1876). Each plaintiff involved here, however, contends that he signed the agreement under economic duress, rendering it voidable, and that there was a lack of consideration supporting it, making it void *ab initio.*

With regard to duress, each testified concerning the circumstances surrounding his execution of the Agreement and Release.[30] In large measure, this testimony recounted their subjective reactions upon learning of the cancellations and Nationwide's withdrawal and upon contemplating its anticipated impact on their business and financial situations, as well as their perceptions of the opportunity to ameliorate these effects through signing the document.[31]

There was testimony showing that the Agreement and Release was given to the agents on or about December 19, 1977, with

---

**28.** *Judging from the absence of argument on the issue in defendant's brief, Nationwide is not contending that judgment notwithstanding the verdict is appropriate on its counterclaim against the ten plaintiffs who signed the Agreement and Release. As a consequence, only the matters of duress and lack of consideration will be addressed in this subsection.*

**29.** *See n.3, supra.*

**30.** *Appendix B contains a summary of each plaintiff's testimony concerning these circumstances.*

**31.** *Much of the agents' concern stemmed from two particular provisions of their Agent's Agreements. The first was the exclusivity provision, which barred licensure with any other companies during the term of the agency relationship. Plaintiffs' Exhibit 1(i) ¶ 4. The second was the non-competition clause, which provided that the companies' liability for Agent's Compensation Security would cease if, among other things,*

[y]ou either directly or indirectly, by and for yourself or as an agent for another, or through others as their agent, engage in or be licensed as an agent, solicitor, representative, or broker or in anyway be connected with the fire, casualty, health, or life insurance business, within one year following cancellation within a 25 mile radius of your business location at that time . . .

*Plaintiffs' Exhibit 1(i) ¶ 11(f)(1). According to the initial notice of cancellation given to all agents on or about October 13, 1977, the non-competition clause was to be waived for all agents after cancellation, but the exclusivity provision was applicable until that time. Defendant's Exhibit 9. In the Agreement and Release, Nationwide waived exclusive representation, permitting the agent to obtain other licenses before cancellation, and agreed not to enforce the non-competition clause and to consider all cancellations "Qualified" for purposes of receiving ¶ 11 compensation. Defendant's Exhibit 18.*

the instruction that if accepted it was to be signed and returned to Nationwide by January 14, 1978.[32] In a few instances, an individual dissatisfied with the terms of the offer attempted to negotiate changes with defendant, which would not agree to any ·amendments or modifications; apparently as a result, those agents never executed the release. During the period between receipt and the designated return date, at least one agents' meeting was held to discuss the terms of the Agreement and Release. Plaintiffs Collins, Dargan, Galasso, Gardner, Major, Maneely, Robinson, and Werner, all of whom signed the release, as well as six or seven of the remaining plaintiffs, testified to attending a meeting at the Howard Johnson's in New Brunswick on January 4, 1978, at which an attorney named Thomas R. Farley reviewed with the agents, the legal ramifications of the various provisions of the release.

■■■ If the agents' assents to the Agreement and Release were procured by means of duress, the documents are "inoperative and voidable." *Rubenstein v. Rubenstein*, 20 N.J. 359, 365, 120 A.2d 11 (1956). Under the modern view, "duress in its extended sense means that degree of constraint or danger, either actually inflicted or threatened and impending . . . as in fact works control of the will." *Id.* The controlling factor is thus the state of mind of the person coerced; the question is whether the complainant was induced to give his consent and would not have done so in its absence. *Id.* at 366, 120 A.2d 11.

■■■ The foregoing, however, is subject to the qualification that "the pressure be wrongful, and not all pressure is wrongful and means in themselves lawful must not be so oppressively used as to constitute, e.g. an abuse of legal remedies." *Id.* at 367, 120 A.2d 11. Thus it is insufficient merely to show that a party's consent was involuntarily given, that his will was overborne; at least in this state, he must show as well that the act or threat is wrongful, "not necessarily in a legal, but in a moral or equitable sense." *Wolf v. Marlton Corp.*, 57 N.J.Super. 278, 287, 154 A.2d 625 (App.Div. 1959). The determination as to whether an act or threat is wrongful is,

> colored by the object of the threat. If the threat is made to induce the opposite party to do only what is reasonable, the court is apt to consider the threatened action not wrongful unless actionable in itself. But if the threat is made for an outrageous purpose, a more critical standard is applied to the threatened action.

*Hochman v. Zigler's, Inc.*, 139 N.J.Eq. 139, 143, 50 A.2d 97 (Ch.1946). For example, where a lessor required an extortionate payment from his lessee to execute a lease with the purchaser of the lessee's business, which business was worth less than the payment, and the lessee acceded, the lessor was compelled to return the payment, *id.*, and where a party under pressure to perform a contract for purchase of a house threatened to resell the house to an undesirable purchaser for the purpose of harming the builder's business, the builder was justified in considering the contract breached and recovering the resultant damages, *Wolf v. Marlton Corp., supra.*

Finally, "[w]hether duress exists in a particular transaction is generally a matter of fact, but what in given circumstances will constitute duress is a matter of law." *Id.* 57 N.J.Super. at 285, 154 A.2d 625.

Having established the test for duress and the considerations by which my review must be guided, I turn now to the facts of this particular case. Essentially, the agents charge that Nationwide's cancellation and withdrawal, given the exclusivity provision in their agreements, in effect threatened them with economic disaster, since the renewal service fees which constituted the

---

**32.** Agent concern over Nationwide's continued enforcement of the exclusivity provision surfaced quickly. Some agents voiced this concern at a November 9, 1977, agents' meeting and again at a meeting on November 30, 1977, at the office of the Commissioner of Insurance.

There was evidence showing that Thomas R. Farley, an attorney acting on behalf of at least some of the agents, met with defendant's representatives and negotiated the Agreement and Release, which was then mailed to all agents.

bulk of their compensation would cease in accordance with the terms of the cancellation notice, and since the agents expected to lose their policyholder clientele if they could not sign on with another company and transfer their policyholders to that company's lines. Under those circumstances, many testified, they felt they had no alternative but to sign.

▇ Nationwide's good faith in making its decision to withdraw from the New Jersey insurance market and to cancel all its agents in the state was never placed in question. Although it had no discernible obligation to do so, defendant agreed to relinquish certain of its rights under the agreements in exchange for the agents' covenant not to sue and their relinquishment of rights to any commissions or benefits they might have or acquire under N.J.S.A. 17:22–6.14a. There was no evidence of any malicious, unconscionable, or outrageous motivation on defendant's part which might render the pressure experienced by the agents wrongful. Nor was there any evidence that the cancellation and withdrawal were intended to create pressure on the agents to sign the Agreement and Release. In short, notwithstanding any subjective condition of mind possessed by an individual agent when he signed the release, defendant's conduct was simply not wrongful and cannot constitute duress.

▇ The defense of duress is impaired for yet another reason—failure on plaintiffs' part to show lack of an immediate and effective legal remedy. *Ross Systems v. Linden Dari-Delite, Inc.,* 35 N.J. 329, 336, 173 A.2d 258 (1961). *See Hochman v. Zigler's, Inc., supra.* As that phrase is used in the doctrine of duress, "[t]he adequacy of

the remedy is to be tested by a practical standard which takes into consideration the exigencies of the situation in which the victim finds himself." *Ross Systems v. Dari-Delite, Inc., supra* at 336, 173 A.2d 258.

Here there was no testimony or other evidence offered by plaintiffs which bore on the issues of inadequacy of remedy or exigent circumstances. On the contrary, the proofs demonstrated that they had time not only to consult with legal counsel but also to seek judicial intervention with regard to both the exclusivity provision and the Agreement and Release itself. Notice of cancellation, and the terms under which it would be effected, was communicated fully 11 months before the effective date. Further, the agents were given almost a month to deliberate over whether or not to sign the Agreement and Release, during which time at least some of them attended a meeting where its terms were discussed by an attorney apparently obtained to advise the agents. As a practical matter, then, it does not appear that circumstances were so exigent as to preclude application to an appropriate court for injunctive relief as to either the exclusivity provision or the release.

Next, I turn to the matter of lack of consideration. In essence, plaintiffs argue that Nationwide gave them virtually nothing in exchange for their covenant not to sue.[33] According to the Agreement and Release, in consideration for the agents' waiver of benefits under N.J.S.A. 17:22–6.-14a and agreement not to sue, Nationwide waived exclusive representation and any claim of ownership or property rights in New Jersey policies and the right to actively compete for that business,[34] and agreed

**33.** On this motion, plaintiffs argue that the most significant reason each agent signed the Agreement and Release was to enable him to transfer policyholders from Nationwide to another company, but that Nationwide's "insistence" on maintaining its New Jersey license and the resultant legal obligation to renew all no-fault automobile insurance policies prevented plaintiffs from realizing the bargained-for consideration. Aside from the fact that this was only one of many reasons given by plaintiffs who signed the release, defendant's failure

to release ownership of those policies would, in any event, amount to a breach of contract rather than lack of consideration. *See* 1 *Corbin on Contracts* § 133 (1963).

**34.** This waiver of ownership rights was qualified by the following statement: "However, the agent and companies understand that some policies may continue to be written by Nationwide directly or reinsured by them." Defendant's Exhibit 18 ¶ 3.

not to enforce the non-competition provision, to make available to each agent a computer listing of his casualty and fire policyholders, to permit the agent to continue his group hospital and surgical-medical coverage for a year following cancellation, to pay Extended Earnings in a different manner than contemplated under the Agent's Agreement, and to pay additional renewal commissions on certain automobile and fire policies, 50% of which commissions would be deducted from the Extended Earnings payment.

■ To be enforceable, a contract must be supported by valuable consideration. *Novack v. Cities Service Oil Co.,* 149 N.J.Super. 542, 549, 374 A.2d 89 (Law Div.1977), *aff'd per curiam* 159 N.J.Super. 400, 388 A.2d 264 (App.Div.1978). "Consideration involves a detriment incurred by the promisee or a benefit received by the promisor, at the promisor's request." *Id.* "[L]egal sufficiency does not depend [,however,] upon the comparative value of the consideration and of what is promised in return." *Tumarkin v. Goldstein,* 33 N.J.Super. 46, 50, 109 A.2d 435 (App.Div.1954). Rather, the consideration "must merely be valuable in the sense that it is something that is bargained for in fact." 1 *Corbin on Contracts* § 131 (1963).

■ In this case, the Agreement and Release contained a recital of the parties' exchange of promises. It is apparent from the face of the document that plaintiff-promisors received specific benefits in exchange for their promise to forbear from suing Nationwide and to relinquish certain rights. Given this recitation and the absence of any evidence tending to show that plaintiffs did not bargain for those benefits in fact, no jury issue was created with regard to lack of consideration.

For the foregoing reasons, defendant is entitled to judgment notwithstanding the verdict on the question of whether the ten plaintiffs who signed the Agreement and Release are barred from maintaining the lawsuit.

## III. NEW TRIAL ON THE COUNTERCLAIM

■ Under *Fed.R.Civ.P.* 59(a),

[a] new trial may be granted as to all or any of the parties and on all or part of the issues (1) in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States . . . .

A motion under this rule may be granted when the verdict is against the weight of the evidence, when the trial was unfair to the moving party, or when harmful errors were committed in the admission or rejection of evidence or in the jury instructions. 6A Moore's Federal Practice ¶ 59.08[1]. The application is addressed to the sound discretion of the trial judge, subject to the qualification that greater caution must be exercised in granting a new trial on the ground that the verdict was against the weight of the evidence, in order to avoid usurpation of the jury's prime function. *Lind v. Schenley Industries, Inc.,* 278 F.2d 79, 90 (3rd Cir.), *cert. denied,* 364 U.S. 835, 81 S.Ct. 58, 5 L.Ed.2d 60 (1960).

In its counterclaim, Nationwide alleged a breach of the Agreement and Release by the ten plaintiffs who signed the document, and sought damages in the amount of litigation expenses incurred in defending this suit as to those former agents. Having obtained an unfavorable verdict on liability, defendant now moves for a new trial, asserting substantial error in the exclusion of Defendant's Exhibit 46 under *Fed.R.Evid.* 403.

■ In order to prevail on the counterclaim, it was incumbent on Nationwide to produce evidence of plaintiffs' bad faith in bringing the suit.[35] *See Artvale, Inc. v.*

---

**35.** Whether liability for litigation expenses may be imposed upon a party who breaches a covenant not to sue depends upon the intention of the parties to the agreement. *Artvale, Inc. v. Rugby Fabrics Corp.,* 363 F.2d 1002, 1008 (2d

Cir. 1966). "In the absence of contrary evidence, sufficient effect is given the usual covenant not to sue if, in addition to its service as a defense, it is read as imposing liability only for

*Rugby Fabrics Corp.,* 363 F.2d 1002 (2d Cir. 1966). "Bad faith" in this context contemplates a state of mind which operates with some motive or intent to do wrong. *New Amsterdam Casualty Co. v. National Newark & Essex Banking Co.,* 117 N.J.Eq. 264, 277, 175 A. 609 (Ch.1934), *aff'd per curiam* 119 N.J.Eq. 540, 182 A. 824 (E. & A.1936). The only direct evidence offered by defendant on the issue of bad faith was a letter written by plaintiff Michael Pomarlen, dated March 8, 1979, and addressed to other former agents, at least some of whom are plaintiffs in this action. At the time it was offered, I sustained plaintiffs' objections to its admission on the ground that, although relevant, its probative value was substantially outweighed by the potential for unfair prejudice arising from the tone of its contents, aggressive language, and certain of the sentiments expressed. Defendant now renews its contention that the offensive sections could have been excised and the remainder admitted.

 On reconsideration, I have concluded the exclusion may actually have been proper under *Fed.R.Evid.* 401 on the grounds of irrelevancy as well as on *Fed.R. Evid.* 403 grounds. The letter was written almost nine months after suit was instituted, and by an individual who did not sign the release. Defendant argued that two plaintiffs who signed releases joined the lawsuit after receiving a copy of this letter and urged that the document is relevant to the state of mind of these plaintiffs. This argument is too attenuated. At best, the letter expresses Mr. Pomarlen's state of mind at that point in time. It has no real tendency to make the existence of the required wrongful intent or motive on the part of the ten "signing" plaintiffs any more probable than not probable.

Since the exhibit was properly excluded, defendant's motion for a new trial on the counterclaim must be denied.

## IV. CONDITIONAL NEW TRIAL

 "if alternative motions for judgment notwithstanding the verdict or for a new trial are made, the trial court should rule on both branches of the motion." *Universal Computer Systems, Inc. v. Medical Services Association of Pa., supra* at 475. *Fed.R.Civ.P.* 50(c) specifically provides at subdivision (1) that where a motion for judgment notwithstanding the verdict is granted, "the court shall also rule on the motion for new trial, if any, by determining whether it should be granted if the judgment is thereafter vacated or reversed, and shall specify the grounds for granting or denying the motion for a new trial." The standard to be used has been discussed, *infra,* at Section II; essentially, the motion may be granted "on the ground that the verdict is against the clear weight of the evidence or when necessary to prevent a miscarriage of justice." *Universal Computer Systems, Inc. v. Medical Services Association of Pa., supra* at 475.

 For the reasons to be given, I have concluded that the motion for a conditional new trial should be granted on all of plaintiffs' claims against Nationwide and on the questions of duress and lack of consideration. As will become evident, this disposition rests for the most part on what I now find to be substantial errors [36] in the instructions to the jury and in the form of verdict sheet utilized. When examining alleged erroneous instructions to the jury, the

suits brought in obvious breach or otherwise in bad faith . . ." *Id.*
In this case, the Agreement and Release is silent with regard to consequences of a breach and there is no indication of an intention to subject to damages those plaintiffs who claimed "in good faith that it had been obtained by unfair means." *Id.*

**36.** *Fed.R.Civ.P.* 61 provides:
No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

Court must view the charge as a whole and determine whether those instructions, "taken as a whole and viewed in the light of the evidence, fairly and adequately submits the issues in the case to the jury." *Ayoub v. Spencer*, 550 F.2d 164, 167 (3rd Cir.), *cert. denied*, 432 U.S. 907, 97 S.Ct. 2952, 53 L.Ed.2d 1079 (1977).

Having now had a fuller opportunity to review the charge, as well as the evidence, I find the instructions to have been sufficiently incomplete as to effect a miscarriage of justice.

■ With regard to plaintiffs' breach of contract claim, the most prejudicial error from Nationwide's standpoint was the omission of precise instructions on the use of extrinsic evidence in construing the meaning of a writing. Assuming for purposes of this motion that construction of the cancellation clause was a matter for the jury and that evidence of representations made to plaintiffs was properly admitted, fuller instruction on the correct use of that evidence was needed.[37]

As given, the instructions simply stated that the jury "must consider the express language of the contracts." No full and complete statement of the parol evidence rule was given. In effect this left the jury free to substitute its own interpretation of the parties' rights with regard to termination. Since the Court cannot be certain that the jury did not do just that, to defendant's extreme detriment, a new trial on the issue is required.

Similar problems exist in relation to the claim of breach of the implied covenant of good faith and fair dealing. Regretfully, there is an absence in the case law of any articulated, comprehensible standards by which a jury may judge an actor's conduct and determine whether in fact a breach occurred. In this case, the inevitable consequence of the instructions given on the issue, as well as counsel's argument in closing, was jury speculation over whether defendant's action was "fair." I conclude that more was needed as the discussion of the implied covenant theory in Section I, *infra*, suggests. The jury charge should have included an explanation of privilege and a statement on the necessity for finding unconscionable behavior on defendant's part.

In addition, since the verdict sheet required the jury to return only a general verdict on this claim, the Court cannot determine whether its conclusion was based on a finding that the covenant was breached because the terminations resulted in deprivation of the renewal commissions, or because inadequate notice was given, or because the termination itself was an act of bad faith. The omission from the verdict sheet of an interrogatory which required the jury to specify the grounds for concluding a breach occurred makes it impossible to ascertain the appropriate measure of damages, as defendant contends. Although plaintiffs argue that juries assess damages for breach of obligations as a matter of course every day, the difference here may be substantial. If the verdict was premised on deprivation of renewal commissions, Nationwide's liability conceivably could extend to all renewal services fees on policies originally written by these former agents; on the other hand, if the jury concluded that notice was inadequate, defendant's liability would be limited to the renewal service fees which would have been paid during whatever period the jury determined would have been reasonable. In addition, if the decision was based on inadequacy of notice, it may be that the jury should have been required to determine what period was reasonable under the circumstances in order to

---

37. Under New Jersey law,

[t]he admission of evidence of extrinsic facts is not for the purpose of changing the writing, but to secure light by which to measure its actual significance. Such evidence is adducible only for the purpose of interpreting the writing—not for the purpose of modifying or enlarging or curtailing its terms, but to aid in determining the meaning of what has been said. So far as the evidence tends to show, not the meaning of the writing, but an intention wholly unexpressed in the writing, it is irrelevant.

*Atlantic Northern Airlines, Inc. v. Schwimmer*, *supra* 12 N.J. at 301–302, 96 A.2d 652.

provide a measurable standard for later assessment of damages by another jury.

■ Next I consider plaintiffs' claim for tortious interference with prospective economic advantage. While I am satisfied that the charge properly listed the elements which plaintiffs were required to prove by a preponderance of the evidence, it did not explain and relate those elements within the context of the facts of this case. In particular, an explanation was needed of the concept of justification, as discussed earlier in this opinion, and defendant's contention that its right to exercise reasonable business judgment, or, in the alternative, its right to terminate the agreements, needed clarification in this two party "interference" case.

I have concluded that the instructions on duress and lack of consideration were similarly inadequate, and as to each, Nationwide was irrevocably prejudiced.

On the defense of duress, I conclude that the lack of an effective and immediate legal remedy was a critical element. *Ross Systems v. Dari-Delite, Inc., supra,* which plaintiffs as proponents were required to prove by a preponderance of the evidence.[38] I had declined to include an instruction on this element upon defendant's request.

■ As to lack of consideration, I conclude that the charge was misleading inasmuch as it erroneously instructed the jury that a promise "must be given in exchange for something which is of detriment to the other party but which is a benefit to the first party," in order for a contract to be valid. T.2894:9–13. Defendant is correct in its contention that the test of benefit or detriment is in the disjunctive rather than in the conjunctive as the Court charged. As given, the instructions eased plaintiffs' task of showing lack of consideration. Furthermore, no cautionary instruction was rendered to the effect that the jury was not to consider the relative values of the promises exchanged. This omission, coupled with plaintiffs' counsel's closing argument which denigrated Nationwide's part of the bargain, may have, and likely did, result in improper weighing of the benefits.

Finally, I have considered, too, the possibility that the jury's verdicts on these issues were the result of passion and prejudice.

Normally an expeditious jury verdict would not be indicative of a jury's failure to properly perform its duties. *Segars v. Atlantic Coastline Railroad Co.,* 286 F.2d 767, 770–71 (4th Cir. 1961). Coupled with other circumstances, however, it may show that the jury was swayed by passion and prejudice in reaching its verdict. *Id.* In this case, which consumed 17 trial days, the jury concluded its deliberations in less than three hours, during which time it was required to consider over 110 exhibits, to consider the testimony as it related to the individual claims of 18 plaintiffs and the counterclaim against ten of those plaintiffs, and to return separate verdicts on the three claims made by each of the 18 plaintiffs and on the defense to the counterclaim and the counterclaim itself. Clearly, this was "the type of case in which a jury has to spend a great deal of time sorting and arranging exhibits and determining the order in which a number of factual issues are to be discussed." *deMars v. Equitable Life Assurance Society of the United States,* 610 F.2d 55, 65 (1st Cir. 1979).

While standing alone this circumstance would not justify a new trial, when viewed in conjunction with the emphasis in closing argument on the need to teach a lesson to people and companies who make promises or representations, and inadequacies which I now find in the charge, I conclude that defendants are entitled to a new trial.

## V. CONCLUSION

In accordance with the foregoing, Nationwide's motion for judgment notwithstanding the verdict pursuant to *Fed.R.Civ.P.* 50(b) is granted, as is defendant's motion for a new trial pursuant to Rule 50(c) in the

---

**38.** Placement of the burden of persuasion on the issues of duress and lack of consideration was clarified for the jury before it finally retired to deliberate, when the Court instructed the jurors that the burden of proving both was on plaintiffs. T.2921:7–9.

event judgment in Nationwide's favor is later vacated or reversed. The motion for new trial on the counterclaim under *Fed.R. Civ.P.* 59(a) is denied.

An order embodying this disposition will be entered by the Court.

APPENDIX A

SYNOPSES OF PLAINTIFFS' TESTIMONY REGARDING REPRESENTATIONS MADE BEFORE AND DURING PARTIES' RELATIONSHIP

1. James A. Borbely, became agent in 1953.

According to Mr. Borbely's testimony, the District Sales Manager ["DSM"] who recruited him stated that the companies expected plaintiff's wife to bear some responsibility during the time plaintiff was a part-time agent; that the companies would not abandon him if he experienced a few bad years, but would work, and meet with him, to resolve the problem, and only if there was no improvement would he be terminated; that if the companies received 15 to 20 complaint letters a year indicating he was not doing his job, and if they could not straighten him out, only then would there be a parting of the ways; that his wife and/or sons could take over the business; that if he lived up to the rules and obligations the companies would take him to retirement and would buy out his business unless he wished a family member to take over; that the companies had only cancelled a man if he was dishonest, wrote for another company, wrote poor business consistently, and did not serve his policyholders.

After he became an agent, the DSM told plaintiff his position was secure in view of his attitude and loyalty to the companies. Plaintiff testified he read the CASH Book assurances regarding contractual stability; that he read the CASH Book as spelling out, in black and white, lifelong security for his spouse and children, and himself in retirement; that he received assurances from Nationwide in-dicating they were coping with their financial problems.

2. Robert Maneely, became agent in 1959. Mr. Maneely testified to the DSM's statements to him regarding lifetime security with Nationwide, and growing together with Nationwide.

During his training, the Regional Training Sales Manager told this plaintiff that Nationwide scrutinized the individuals they hired because they wanted qualified people and planned to keep them until retirement. When Mr. Maneely received the CASH Book in 1969, according to his testimony, he saw an opportunity for lifetime security and future financial benefits. He also began planning for retirement at 65 and the take-over of his business by his children.

3. Ralph Mangione, became agent in 1969. The DSM who recruited Mr. Mangione discussed the opportunities for self-management, development of his own business and growing with it, good retirement and hospitalization programs, and lifetime security if he were accepted as an agent. The DSM also indicated plaintiff's wife would have to assist in the business if plaintiff wanted to develop the agency successfully. A Regional Sales Training Manager told plaintiff that Nationwide wanted qualified people because they planned to keep such people until they retired.

4. Joseph A. Donofrio, became agent in 1960.

This plaintiff testified that the DSM who recruited him promised security and an opportunity to build up a retirement, as well as the prospect of transferring his business to his children.

5. Thomas P. Gardner, became agent in 1954.

At the time the CASH Book was presented, this plaintiff noticed its contents, including information on bringing his family into the business and the pension plan, which he believed would give agents security until age 65 and a nice retirement after that age. At one point in his agency, when Mr. Gardner was concerned

with a high loss ratio, he spoke with his DSM about whether this would pose a problem. The DSM informed him that an agent would only rarely be terminated for loss ratio, since the company would try to work it out with underwriting; also, that the only other reason for cancellation would be stealing or fraud. At a meeting of the New Jersey Sales Agents' Advisory Council which plaintiff attended on February 12, 1976, he was told agents were never terminated arbitrarily, that the DSMs could not terminate an agent unilaterally, and that agents had a high level of security.

6. Robert P. Werner, became agent in 1970.

Mr. Werner testified that the DSM who recruited him told him that if, after completing the initial program successfully, he continued to work diligently, servicing his customers, he would have a lifelong career with Nationwide; that, in answer to an inquiry about a section of the CASH Book relating to passing on the business to his children, the DSM said it was most commonly done and usually presented no problem; that, before signing the Master Agreement, he had asked the DSM about the non-competition clause and the possibility of changing it, and the DSM replied that it could not be changed. An official of the Middle Eastern Regional Office ["MERO"], at a training course which this plaintiff attended, told the new agents that if they established themselves during the training period by working hard, they would have their own businesses and enjoy a lifelong career with the companies; and that they should keep out of trouble because they had a good thing going.

7. Michael Pomarlen, became agent in 1972.

According to Mr. Pomarlen's testimony, during recruitment he was told by the DSM that if he was a productive agent and acceptable to the company, he would have a lifetime career with Nationwide; that it was a great opportunity; that it was a family-oriented company, and that

if he joined, was productive, honest, trustworthy, and had integrity, he would have unlimited income and unlimited security in the form of a lifelong career; that, in relation to the CASH Book, he was told it was his Bible and was shown a passage supporting earlier representations regarding unlimited, lifetime security.

8. William J. Steihl, became agent in 1970. The DSM who recruited him, and the Regional Sales Manager he spoke to around that time, told this plaintiff about the benefits of becoming an agent, including lifelong security for his family and the ability to pass the business along to his family. When Mr. Steihl signed the agreement, he objected to some terms, and the DSM told him not to worry, that it was a mere formality and the CASH Book was his Bible. While he was an agent, the DSM continuously told him about an agent's financial security and unsurpassed retirement, as well as the bright future this plaintiff and his children had in view of his sales record.

9. Donald P. Hilla, became agent in 1958. Kathleen Hilla, widow of this plaintiff and executrix of his estate, testified only briefly and made no statements concerning representations by Nationwide personnel.

10. David B. Collins, became agent in 1960. This plaintiff testified that the DSM assured plaintiff's wife that plaintiff would be set for life if he went with Nationwide; that when he signed on as a part-time agent, the DSM told him that so long as he did not steal or cheat or engage in similar behavior, he would be set for life; that when he was approached about becoming a full-time agent, the DSM told him he would have no problems with termination as long as he kept his nose clean and tried to do a good job. At the time the CASH Book was issued, and the pension plan amended, plaintiff was told the security offered was the same, barring dishonesty on his part.

11. Joseph Dargan, became agent in 1956.

When this plaintiff met with the DSM who recruited him, he was told about the agent's fine life, job of high repute, and the possibility of building the agency, going full-time, and working toward retirement. Later, another DSM talked with him about the benefits of becoming a full-time agent, including security, retirement to look forward to, and passing the business on to his son. At the time Mr. Dargan was changing from salary to straight commissions, he was encouraged to work hard in order that he could enjoy lifelong security and retirement.

In 1969, when he received the CASH Book at an agents' meeting, he was shown a slide presentation concerning the good relations between the company and its agents and the available contract benefits such as retirement and lifetime security. Later, he was told agents had the best job in the company because if they did a good job and did not steal, they would be agents until retirement and could then pass the agency on to their children.

12. Victor Major, became agent in 1960.

Mr. Major testified that the DSM told him upon recruitment that as long as he was honest and produced, he could retire from the company; that it was a good opportunity; that an agent who did his job could expect full lifetime security with Nationwide and a good retirement plan. When the CASH Book was introduced, this plaintiff used it like a Bible because it was the Nationwide contract, providing information on benefits like hospitalization and on commissions.

13. Anthony T. Galasso, became agent in 1953.

At the time he was recruited, this plaintiff was told about the opportunities for growth and prosperity with Nationwide, about the chance to spend his lifetime with the companies and to leave his business to his children, and about living and retiring well. Later, during a small meeting with two other agents, a Nationwide representative told them that they were building security for their families and that they need not fear being terminated without good cause because in effect they had lifetime security. At another agents' meeting during the early years of his relationship with the companies, he was told about Nationwide's bright future, and that he could spend the rest of his life with the companies, resting secure in the knowledge that he was building renewals to make a good income.

14. Edward Lubowicki, became agent in 1968.

At a recruitment session with Mr. Lubowicki and his wife, the DSM told him that as long as he was willing to work he need not worry about the future, that he had lifetime security. At a meeting of the MERO Regional Advisory Board, Mr. Lubowicki was told the Nationwide agency force had the greatest security of anyone working for the companies; that the speaker knew of no one who had been terminated only for lack of production; that if a man was not really interested in producing more, despite being given assistance to do so, only then would the companies and the agent part ways; that most agents were terminated because they were not focusing on Nationwide business; that termination was not done lightly; and that if an agent was being harassed, they should notify the DSM's superior.

15. Michael James Fantozzi, became agent in 1956.

When a full-time agency was being discussed with Mr. Fantozzi, he was told that if he did make the decision, he would be married to Nationwide, that it was a "death-do-us-part" situation; that being with Nationwide was like being in a family.

16. Morris Winograd, became agent in 1953.

In answer to Mr. Winograd's expression of concern over the termination and exclusivity clauses in the agreement, the DSM who recruited him told him that the company was moral and honest, never firing a man summarily but trying to work with him. The DSM also told him

APPENDIX A—Continued

about passing the business on to a family member. In later discussions about termination, this plaintiff was told there had never been an instance of termination without proper cause.

17. Edwin G. Robinson, became agent in 1960.

Upon recruitment, the DSM told him that if things worked out right and he was not dishonest, he had a perfect future with Nationwide and probably lifetime security. When he became a full-time agent, he was informed it was a golden opportunity, with fringe benefits like security, lifetime security, compensation, and incentive credits. The Regional Vice-President and Regional Sales Training Manager told him of lifetime security and income limited only by his ability to sell and his willingness to work. His DSM also told him it was a lifetime job; that he should not worry as long as he was not dishonest; that he should keep his nose clean because of the financial security available with Nationwide. When the CASH Book was distributed he believed it was a better contract because of the retirement fund.

18. William G. Peters, became agent in 1963.

The DSM who recruited Mr. Peters discussed the lifetime security offered, the chance to build a business of his own, the lasting benefits to his family, and the possibility of passing the business on to a member of his family.

APPENDIX B

SYNOPSES OF PLAINTIFFS' TESTIMONY CONCERNING CIRCUMSTANCES UNDER WHICH AGREEMENT AND RELEASES WERE SIGNED

1. David B. Collins.

This former agent testified that if he did not sign it, he would have nothing; that he could salvage something by executing the document, such as his policyholders; moreover, at age 58, all would be "gone."

2. Joseph Dargan.

Mr. Dargan testified there were five reasons why he signed the Agreement and Release: 1) because with the release from the exclusivity provision, he could go out and get another company with which to place business upon his termination from Nationwide; 2) waiver of the territorial restrictions [that is, the non-competition clause] meant he could remain in business in his home town; 3) with the companies' relinquishment of business, he could go back and recapture that business without competition from Nationwide; 4) defendant's agreement to keep the group health plan in force for a year was important since he had a wife and ten children; and 5) the agreement to pay extended earnings over three years would tide him over in the event of financial hardship.

3. Anthony T. Galasso.

According to his testimony, this plaintiff decided that if he wanted to remain in his business he had better sign it; that he mulled it over for many weeks before signing and mailing it; that he agreed so he could sign up with another company, otherwise he would be "zeroed," that is, on September 30th he would have no company and no business; and that he wanted to keep his policyholders because he would lose them or they would be uninsured.

4. Thomas P. Gardner.

Mr. Gardner stated he understood that he could not represent another company but that he had received an offer to go into another office with an agent for another company; he was concerned that if he moved and represented another company it would jeopardize his retirement benefits with Nationwide; also, he was concerned about losing the business, that is, the policyholders, for which he had worked 24 years.

5. Victor Major.

This plaintiff testified there were essentially two reasons why he signed: first, he needed money for survival and to say in business, and the provision for 50% of the guaranteed renewable policies for one year, while not much, would help; and second, so he could sign with another company and continue to write business.

He also states there was no other choice given by the companies.

6. Robert Maneely.

Mr. Maneely stated he thought there was no other alternative; that he panicked and had no other choice; that he had 2,000 policyholders.

7. Ralph Mangione.

According to this plaintiff he signed the form for a variety of reasons: when the notices were sent out to policyholders, they called him thinking the agents were going out of business as well, and he was concerned about placing their business and not losing nine years of work; that Nationwide promised to give him 50% of the five-year guaranteed renewable commissions; that Mr. Fietkiewicz indicated Nationwide would look favorably on people who signed the Agreement and Release and that he, personally, would try to place those agents with other companies; and that the non-competition clause would be waived, enabling him to maintain his business, over which he states the defendant agreed to release ownership.

8. Edward G. Robinson.

Mr. Robinson stated he signed the Agreement and Release under duress; that he signed because of the wording and conversations he had with other agents and company personnel; that it was easier to sign because if he did not he stood a chance of losing 18 years of work; that the companies would give up their exclusivity rights and ownership of the policies which meant he could go out and compete for his own business back again.

9. William J. Stiehl.

Mr. Stiehl's first consideration in signing the document was to be able to support his family, and the second was to allow him to continue in his chosen profession with a good relationship with other companies who might employ him, that is, he perceived if he did not sign, he would get a bad recommendation by breaching the contract.

10. Robert P. Werner.

This plaintiff testified that he saw the Agreement and Release as the solution to a number of things which were distressing him at the time; that if he were to sign with another company, Nationwide would cancel him and cut off his income immediately; and that Nationwide seemed unsure of what it was doing in cancelling policies.