**ARTVALE, INC., Plaintiff-Appellant-Respondent,**

v.

**RUGBY FABRICS CORP. and Barmil Associates, Ltd., Defendants-Respondents-Appellants.**

No. 398, Docket 29239.

United States Court of Appeals Second Circuit.

Argued May 27, 1966.

Decided July 15, 1966.

Jay H. Topkis, New York City (Paul, Weiss, Rifkind, Wharton & Garrison, New York City; Sidney S. Rosdeitcher on brief, Emanuel R. Posnack, New York City, of counsel), for plaintiff-appellant-respondent.

James N. Buckner, New York City (Brumbaugh, Free, Graves & Donohue, New York City, Joseph D. Garon, New York City, of counsel), for defendants-respondents-appellants.

Before FRIENDLY, HAYS and FEINBERG, Circuit Judges.

FRIENDLY, Circuit Judge.

Artvale, Inc., plaintiff in an action for patent infringement in the District Court for the Southern District of New York, appeals from Judge Levet's dismissal of the complaint as barred by a settlement agreement, 232 F.Supp. 814 (1964). Defendants cross-appeal from the dismissal of their counterclaim for damages for plaintiff's breach of a covenant not to sue therein contained. A previous appeal in related litigation was decided against the plaintiff, 303 F.2d 283 (2 Cir. 1962). We affirm.

The facts have been so well recounted by Judge Levet that we limit ourselves to a bare summary. Plaintiff's patent was issued in 1954 to Fredric L. Aibel and, as stated in the first paragraph of the specifications, "relates to knitted fabrics of mesh formation and of net characteristics having a lace-like appearance." The specifications go on to say that:

"The basic requirements for the production of the various fabrics of my invention are: (1) that only one bar knits at any course—the back bar floating or laying-in when the front bar knits, and the front bar floating when the back bar knits; and (2) that a pair of threads, one derived from each of the two bars, make, in the series set-up, one or more stitches on two adjacent needles."

They explain how various forms of the fabric, depicted in figures, are knitted and give typical formulae for setting the cams that control the two knitting bars which produce them. The claims of the patent do not refer to the figures as such.

In 1956 three actions involving the patent were instituted, one being for infringement against Rugby Fabrics Corporation, a defendant in the instant suit. A principal subject of complaint by the plaintiff was the then current manufacture and sale of what was known as the Harris Fabric, for which a patent was later issued. Although this fabric in its finished form had an appearance virtually identical with that produced under the Aibel patent, its construction differed materially in that only the front bar knitted loops and, in consequence, the mesh was not locked in and was subject to snags and runs. Of apparently greater concern to the plaintiff was that various defendants were also manufacturing fabrics which more plainly took advantage of Aibel's invention.

The actions were settled on October 26, 1959, by a settlement agreement of which the two provisions most significant for the controversy now before us are paragraphs (2) and (3). By the former the defendants agreed to discontinue during the term of Aibel's patent the manufacture, use or sale

"of the following netting material made on a warp or Raschel type knitting machine having a front bar and a rear bar: netting material made of diamond mesh fabric constructed

according to Figure 4 of the said patent in suit, and of hexagonal mesh fabric constructed according to Figures 1 and 2 of said patent, the following formula, set forth in lines 53 and 54, column 6 of said patent, being one of the formulas for making said diamond mesh fabric:

Chain I: 20, 00, 24, 44
Chain II: 00, 02, 44, 42

the following formula, set forth in lines 48 and 49, column 6 of said patent, being one of the formulas for making said hexagonal mesh fabric:

Chain I: 20, 22, 20, 24, 22, 24
Chain II: 00, 02, 00, 44, 42, 44"

Paragraph (3) provided:

"That the provisions of Paragraph (2) hereof shall not apply to other materials that do not have the specific structures set forth in Paragraph (2) hereof, it being agreed that diamond mesh fabrics made with one bar always knitting and one bar always laying in are among such other materials that do not have the specific structures set forth in Paragraph (2) hereof and Artvale agrees not to bring suit against George Knitting Mills, the said former partners, Rugby and A & W for infringement, or otherwise involve them in litigation under the patent in suit because of their making, selling or using such other materials."

Provision was made for the entry of "a judgment of infringement and decree against further infringement," all claims for past infringement being released. The judgment, entered the same day, found infringement and directed:

"That the defendant, its officers, directors, agents, employees, servants and those claiming any rights under and through it, be and hereby are enjoined and restrained from manufacturing, using or selling netting fabrics constructed specifically according to Figures 1, 2 and 4 of said patent."

Shortly thereafter Rugby began the manufacture of a fabric with hexagonal shaped meshes which, unlike the Harris fabric, involved the knitting of loops by both bars. When plaintiff moved to punish Rugby for contempt, Judge Palmieri denied the motion; we affirmed *per curiam*, finding "that there were differences between defendant's and plaintiff's fabrics in sequence and type of stitches, in interrelationship of the two threads, and otherwise, and that these amounted to substantial differences in structure." 303 F. 2d at 284. Our opinion, however, contained language indicating that the prohibitions of the settlement agreement might be broader than those of the consent judgment. Plaintiff thereupon brought this action, and defendants pleaded the agreement as a bar and counterclaimed for damages for plaintiff's breach of its covenant not to sue. After a six day trial, during which plaintiff accused a fabric containing alternate horizontal rows of diamonds and hexagons, Judge Levet found that defendants' fabric was not constructed in the manner described in paragraph (2) of the settlement agreement and was within the protection of paragraph (3), and therefore dismissed the complaint. Believing that recovery of counsel fees and related items for plaintiff's breach of its covenant not to sue was governed by New York law and precluded by it, he likewise dismissed defendants' counterclaim.

I.

The letter of the settlement agreement supports Judge Levet's conclusion that plaintiff's suit was barred. The cross-references between paragraphs (2) and (3) confirm defendants' construction of the agreement as all-embracing, i.e., manufacture and sale of a fabric were either prohibited by paragraph (2) or permitted by paragraph (3). It is evident also that the permission of paragraph (3) is not limited to "diamond mesh" fabrics, like the Harris fabric, "made with one bar always knitting and one bar always laying in"; these are stated to be only "among such other materials that do not have the specific structures set forth in Paragraph (2)

hereof." It is plain also that paragraph (2) was very narrowly drawn. The paragraph does not say that defendants are prohibited from making all fabrics that either meet Aibel's "basic requirements" as stated in the specifications, or would infringe some or all of the claims; it says that defendants may not make a fabric "constructed according to" certain figures in the specifications, and paragraph (3) emphasizes defendants' freedom to make materials that do not have "the specific structures set forth in paragraph (2)." On the factual point that the accused fabrics do not have these structures, we cannot improve on what Judge Levet has written.

Having said all this, we must concede the force of the argument that such an interpretation makes the agreement of so little benefit to the plaintiff that sensible businessmen could hardly have meant it to be read that way. The parties must have known, the plaintiff insists, how easy it would be to design around Figures 1, 2 and 4 and manufacture mesh that nevertheless embodied Aibel's basic invention and would be within the claims, although having a structure differing from the figures in unessential respects. It was to prevent this, the argument goes, that in the course of negotiation paragraph (2) was changed to characterize the specific knitting formula set forth as merely "one of the formulas" for making the proscribed fabric.[1] Yet, as against this, in precluding suit for "infringement" as to fabrics not having the "specific structures" set forth in paragraph (2), paragraph (3) on its face protected the manufacture and sale of such fabrics even though they might be within the claims under the doctrine of equivalents or otherwise; and how the position the plaintiff now takes is less broad than its patent rights has not been explained in any fashion intelligible to the district judge or to us. Parties can make poor settlements as

well as good ones, and the agreement would not be so senseless as contended if plaintiff and its then counsel had thought that no structures other than those specifically suggested in the figures would have the desirable features of its product or that the patent's validity or scope did not extend further. With the practical considerations thus inconclusive, a court does well to stick rather closely to the words the parties used.

Two other considerations reinforce our conclusion to affirm. The first is the thorough study given the matter by the district judge who saw and heard the parties and the expert witnesses. Although ultimate decisions on the meaning and application of a contract are not findings of fact within F. R. Civ. P. 52(a), they may rest on subordinate determinations that are. Judge Levet's finding that defendants' fabrics do not have "the specific structures set forth in Paragraph (2)" is closely akin to the evaluation typically made with respect to infringement, an issue on which decisions of trial judges are regarded as findings of fact within the "unless clearly erroneous" rule. Graver Tank & Mfg. Co. v. Linde Air Prods. Co., 339 U.S. 605, 609–610, 70 S.Ct. 854, 94 L.Ed. 1097 (1950); Carolina Lee Knitting Co. v. Johnson & Johnson, 275 F.2d 91, 93–94 (4 Cir. 1960). Moreover, plaintiff's contention that a literal construction must be rejected because of failure to accord with the expectations of the parties raises a question what the latter were, and that issue also is one of fact. The common approach seeking to dichotomize all decisions as either "law" or "fact" is too simplistic; a reviewing court must often dissect the judgment into its component parts. Cf. Baranow v. Gibraltar Factors Corp. (2 Cir. 1966), slip opinions 2627, 2632–35. In any event, we know of no principle forbidding an appellate court which lacks profound convictions as to the construction or application of a con-

---

1. The district court, however, found that the additional language did not enlarge the prohibition but was inserted simply "to express the intent of the parties that the prohibition was to preclude the fabric illustrated in Figure 4 regardless of the knitting formula employed."

tract from deferring to the carefully reasoned conclusions of a respected trial judge who has had a better opportunity to get "the feel of the case." See Cone v. West Virginia Pulp & Paper Co., 330 U.S. 212, 216, 67 S.Ct. 752, 91 L.Ed. 849 (1947).

The second consideration is that despite the use of differing terms to define the prohibitions in the settlement agreement and the consent decree, see 303 F.2d at 284, we are of the view that the variation in the language is not so significant as to warrant a conclusion that the parties meant to say two different things on the same day. When subjected to close scrutiny, the narrow reach of the agreement to "the specific structures set forth in Paragraph (2)" which in turn is limited to fabrics "constructed according to" the specified figures in the patent, is seen to be substantially coterminous with the consent judgment's proscription of materials "constructed specifically according to Figures 1, 2 and 4 of said patent." The inability of the able and assiduous counsel now representing plaintiff to provide an explanation for the supposed discrepancy is rather convincing evidence that the parties never suspected there was any. Under these circumstances, the significant choice of restrictive terminology that led Judge Palmieri and the previous panel to find against the plaintiff on the motion for contempt of the decree leads to the same conclusion with respect to the agreement.

## II.

The damages sought by defendants for plaintiff's breach of its covenant not to sue were limited to litigation expenses, namely, counsel fees and disbursements, charges of expert witnesses, the salary of defendant's president while occupied with the litigation, and clerical expenses in preparing for trial. Other damages relating to business reputation and loss of customers were alleged in a separate counterclaim for unfair competition but were never proved.

■■ We do not at all agree that the validity and construction of a covenant not to bring a suit for infringement of a United States patent, a suit which can be brought only in federal court, 28 U.S.C. § 1338(a), are matters in which such a court would necessarily be required to defer to state law. In Sola Elec. Co. v. Jefferson Elec. Co., 317 U.S. 173, 175, 63 S.Ct. 172, 87 L.Ed. 165 (1942), holding that a patent licensee defending a licensor's action for deviation from fixed prices could not be barred by state doctrines of estoppel from challenging the validity of the patent, the Supreme Court declined to decide whether in a case not involving the antitrust laws estoppel of a licensee would be an issue of state or of federal law. Later it seems quite clearly to have resolved the question in favor of federal principles. Scott Paper Co. v. Marcalus Mfg. Co., 326 U.S. 249, 255–256, 66 S.Ct. 101, 90 L.Ed. 47 (1945). Federal law has been held to govern the effect of the release of a claim of a railroad worker under the FELA, Dice v. Akron, C. & Y. R.R., 342 U.S. 359, 72 S.Ct. 312, 96 L.Ed. 398 (1952), of a claim based on the Securities Exchange Act, Stella v. Kaiser, 221 F.2d 115 (2 Cir.), cert. denied, 350 U.S. 835, 76 S.Ct. 71, 100 L.Ed. 745 (1955), and of a claim for treble damages under the antitrust laws, Twentieth Century-Fox Film Corp. v. Winchester Drive-In Theatre, Inc., 351 F.2d 925, 928 (9 Cir. 1965), cert. denied, 382 U.S. 1011, 86 S.Ct. 620, 15 L.Ed.2d 526. Accord, Taxin v. Food Fair Stores, Inc., 197 F.Supp. 827, 832–833 (E.D.Pa.1961); Dale Hilton, Inc. v. Triangle Publications, Inc., 198 F.Supp. 638 (S.D.N.Y. 1961); contra, Solar Elec. Corp. v. General Elec. Co., 156 F.Supp. 51, 58 (W.D. Pa.1957). See also Garrett v. Moore-McCormack Co., 317 U.S. 239, 63 S.Ct. 246, 87 L.Ed. 239 (1942). A recent Supreme Court decision with respect to the effect of a release of patent claims treated the question as one of federal law. Aro Mfg. Co. v. Convertible Top Replacement Co., 377 U.S. 476, 501, 84 S.Ct. 1526, 12 L.Ed.2d 457 (1964). But cf. Gillman v. Stern, 114 F.2d 28, 32 (2 Cir. 1940), cert. denied, 311 U.S. 718, 61

S.Ct. 441, 85 L.Ed. 468 (1941). Whether breach of a covenant not to sue for patent infringement gives rise to a claim for damages, only a step beyond the effect of a release, is within the competence of the federal judiciary to determine free from Erie inhibitions.

Whether a distinct federal rule should be adopted is a closer question. Federal courts have traditionally respected many state rules relating to patents which were not inconsistent with federal law, see Ellis, Patent Assignments §§ 270–71 (1955); indeed there is a long line of authority upholding state and denying federal court jurisdiction over claims on such collateral matters. See, e. g., Albright v. Teas, 106 U.S. 613, 1 S.Ct. 550, 27 L.Ed. 295 (1882); New Marshall Engine Co. v. Marshall Engine Co., 223 U.S. 473, 32 S.Ct. 238, 56 L.Ed. 513 (1912); Geneva Furniture Mfg. Co. v. S. Karpen & Bros., 238 U.S. 254, 35 S.Ct. 788, 59 L.Ed. 1295 (1915); American Well Works Co. v. Layne & Bowler Co., 241 U.S. 257, 36 S.Ct. 585, 60 L.Ed. 987 (1916); Luckett v. Delpark, Inc., 270 U.S. 496, 46 S.Ct. 397, 70 L.Ed. 703 (1926); cf. Wilson v. Sanford, 51 U.S. (10 How.) 99, 13 L.Ed. 344 (1850). Restriction of a private monopoly right after an invention has been disclosed to the public would hardly attract the same Congressional concern as may be thought to exist with regard to railroad workers under the FELA or the private enforcement of the securities and antitrust acts. The need for uniformity, see United States v. Yazell, 382 U.S. 341, 354, 86 S.Ct. 500, 15 L.Ed.2d 404 (1966), is not altogether compelling when the issue does not impinge on the federal administration of the patent laws, see Mishkin, The Variousness of "Federal Law": Competence and Discretion in the Choice of National and State Rules for Decision, 105 U.Pa.L.Rev. 797, 821 (1957). Still, in addition to a proper concern that an owner enjoy the benefit of his patent, there is a federal interest in protecting manufacturers and the federal courts themselves from repetitive and burdensome assertion of patent claims—an interest manifested in the provision of 35 U.S.C. § 285 empowering the courts to award attorney's fees to the prevailing party in exceptional cases. Because of the number of possible defendants, the place where a patent infringement suit is brought or maintained and thus will likely be settled may be quite unrelated to the place of business of either of the principal parties in interest, see 28 U.S.C. § 1400(b), and the patent specialists who usually litigate such suits probably are not and perhaps should not be expected to be familiar with local doctrines as to covenants not to sue. If such interests were considered to require fashioning a federal rule on the consequences of breach of a covenant not to sue for infringement, the authorities sustaining state court jurisdiction over matters incident to patents could readily be distinguished as concerned only with the construction of predecessors of 28 U.S.C. § 1338(a), vesting federal courts with exclusive jurisdiction of any civil action "arising under any Act of Congress relating to patents," since the boundaries of that grant may be less extensive than the coverage of "federal common law" in such matters. See T. B. Harms Co. v. Eliscu, 339 F.2d 823, 827–828 (2 Cir. 1964), cert. denied, 381 U.S. 915, 85 S.Ct. 1534, 14 L.Ed.2d 435 (1965); ALI Study of the Division of Jurisdiction Between State and Federal Courts 59–60 (Tent.Draft No. 4, 1966).

Interesting as this issue is, we find its resolution unnecessary since, as so often happens, we discern nothing in New York law that would lead us to a decision different from what we would independently reach. The New York cases relied on by the district court as forbidding the award of litigation expenses do not appear to us to be truly relevant. They hold only that, absent special statutory authorization, a plaintiff in a non-contractual action may not recover the expenses of obtaining recovery other than court costs, and that a contract plaintiff may not unless his agreement entitled him to that relief. Thus, in the typical contract action for indemnity, see Doyle

v. Allstate Ins. Co., 1 N.Y.2d 439, 154 N.Y.S.2d 10, 136 N.E.2d 484 (1956), the indemnitee, though entitled to be reimbursed for legal expenses incurred in defending a third person's suit against him, may not recover the expense of obtaining reimbursement from the indemnitor—for the excellent reason that the indemnitor never agreed he should. We find nothing in the New York decisions to indicate that if a contract ought fairly to be construed as covering such reimbursement, the provision would not be given effect. Cf. Marcy Lee Mfg. Co. v. Cortley Fabrics Co., Inc., 354 F.2d 42 (2 Cir. 1965). And no New York case cited to us reads on the question whether a party who has breached a covenant not to sue is liable for litigation expenses inflicted on his adversary. The issue appears to hinge on what the parties intended by their contract.

The venerable decision unearthed by the industry of defendant's counsel, Scott v. Reedy, 5 Ohio Dec. Reprint (368) 388 (Super. Ct. 1876), found that where the defendant had agreed to dismissal of its pending suit upon an adverse adjudication in arbitration, the expense of plaintiff's counsel in resisting the action after the award was to be "regarded as having been in contemplation of the parties in entering into the contract." Another precedent, doubtless too recent to have come to counsel's attention, emanated from a court of greater standing and, though reaching the opposite result, is consistent with this approach. In Winchester Drive-In Theatre, Inc. v. Warner Bros. Pictures Distributing Corp., 358 F.2d 432, 436 (9 Cir. 1966), the court assumed that attorney's fees incurred in defense of suit would be a proper item of damages if the suit was in plain breach of a covenant not to sue,

but declined to give such recovery on the ground that the provisions did not extend to an action challenging in good faith the very existence of the covenant itself.[2] Similarly we do not think the parties here intended the formal covenant to subject the plaintiff to damages for a good faith test of its scope, just as we would not read such a covenant, without more, as intended to subject to damages a plaintiff who claimed in good faith that it had been obtained by unfair means.

■■■ The question, in other words, is to be solved not by invoking an abstract rule of law but by seeking to determine what the parties fairly contemplated, or would have had they addressed their minds to the problem. Certainly it is not beyond the powers of a lawyer to draw a covenant not to sue in such terms as to make clear that any breach will entail liability for damages, including the most certain of all—defendant's litigation expense. Yet to distill all this out of the usual formal covenant would be going too far; its primary function is to serve as a shield rather than as a sword, often being employed instead of a release to avoid the common law rule with respect to the effect of a release on joint tort-feasors. In the absence of contrary evidence, sufficient effect is given the usual covenant not to sue if, in addition to its service as a defense, it is read as imposing liability only for suits brought in obvious breach or otherwise in bad faith—clearly not the situation here.

The judgment is therefore affirmed on both appeals. Since most of the costs were incurred on plaintiff's appeal, defendants may recover two-thirds of their costs.

---

2. The court, although not discussing the point, evidently considered itself free to decide the issue as one of federal law.