The QUILL COMPANY, INC.

v.

A.T. CROSS COMPANY.

No. 82–55-Appeal.

Supreme Court of Rhode Island.

May 25, 1984.

James K. Edwards, Edwards & Angell, Providence, for plaintiff.

Michael P. DeFanti, Hinckley & Allen, Providence, for defendant.

OPINION

MURRAY, Justice.

This case is before the court upon the joint motion of both parties to certify their dispute to us from the Superior Court pur-

suant to G.L.1956 (1969 Reenactment) § 9–24–25. It involves a question of first impression in this jurisdiction—whether a nonbreaching party to a covenant not to sue may recover as damages for breach of that covenant litigation expenses that it has incurred in defending against a claim brought in breach of said covenant? Our review of the relevant authorities convinces us that such damages should be recoverable in certain circumstances, although we consider this case an inappropriate one in which to apply such a rule. The facts pertinent to this appeal have been stipulated to by the parties and are set out below.

1. The plaintiff, The Quill Company, Inc. (hereinafter Second Quill), is a Rhode Island corporation with its principal place of business in Providence, Rhode Island. It is, and has been since its incorporation, a wholly owned subsidiary of T & T Manufacturing Company (hereinafter T & T), also a Rhode Island corporation with its principal place of business in Providence, Rhode Island.

2. The defendant, A.T. Cross Company (hereinafter Cross), is a Rhode Island corporation with its principal place of business in Lincoln, Rhode Island.

3. In October 1965 Cross brought an action in the United States District Court for the District of Rhode Island (C.A. No. 3563), alleging infringement of its trademark registration No. 543,934 and unfair competition by the manufacture and sale of mechanical pens and pencils by a Rhode Island corporation named The Quill Company (hereinafter First Quill). First Quill denied the validity of said trademark registration, the infringement thereof, and unfair competition.

4. After completion of discovery in said action (hereinafter the Cross-First Quill Action) and as of November 29, 1967, Cross, believing that First Quill was about to go out of business (which in fact did occur) and that further sales would simply be liquidation of inventory, entered into an agreement (hereinafter the Settlement Agreement) with First Quill. Cross did not communicate to First Quill its belief that First Quill was going out of business nor did Cross incorporate that understanding as a condition of its covenant not to sue.

5. The settlement agreement provides in part as follows:

"WHEREAS, the parties desire to settle all claims involved in said Civil Action on the terms herein set forth.

"NOW, THEREFORE, in consideration of the premises [sic] and of the covenants and agreements herein contained, the parties have agreed as follows:

1. QUILL hereby agrees not to manufacture or sell any writing instrument which has an exterior appearance closer to the exterior appearance of the CROSS pen and pencil attached hereto as Exhibits A and B than the exterior appearance of the QUILL pen and pencil attached hereto as Exhibits C, D, and F, so long as the said CROSS trademark is respected by the trade and said trademark registrations remain in full force and effect.

2. CROSS agrees that it will not sue QUILL for unfair competition, infringement of said trademark or infringement of said trademark registrations unless QUILL breaches the agreement of paragraph 1.

3. CROSS hereby releases QUILL and its customers from all debts, complaints, demands and causes of action whatsoever such as have arisen by reasons of or in any manner grown out of the facts alleged in said Civil Action prior to the date of this agreement.

4. The parties agree that forthwith after the execution of this agreement said Civil Action shall be terminated by a Consent Judgment dismissing it without prejudice and without any award of damages or costs to either party.

5. This agreement shall be deemed to constitute a contract made under the laws of the State of Rhode Island and for all purposes shall be construed in accordance with the laws of such State.

6. This agreement shall be binding upon and inure to the benefit of each party, its successors in business and assigns."

No discussions took place between First Quill and Cross regarding the availability of damages or attorney's fees in the event Cross thereafter instituted suit.

6. An order dismissing the Cross-First Quill action without prejudice was entered by said United States District Court on December 18, 1967, by agreement of the parties.

7. On November 1, 1969, Cross filed an application for trademark registration for certain of its pen styles. A manufacturer of pens and pencils, T & T, opposed the application. Its opposition was dismissed on April 27, 1973, by the Trademark Trial and Appeal Board upholding the validity of the Cross registration.

8. In March of 1972, while the opposition was pending, T & T arranged for First Quill to assign to T & T its rights under the settlement agreement between First Quill and Cross.

9. In the First Quill-T & T assignment, First Quill agreed not to resume the manufacture and sale of pens or pencils having appearances like or similar to the appearance of said exhibits C, D, and F pens and pencils and to change its corporate name to omit the word "Quill" therefrom.

10. On September 21, 1972, T & T incorporated Second Quill as a wholly owned subsidiary; on September 28, 1972, T & T executed an assignment of its rights under the 1967 settlement agreement to Second Quill. Second Quill began manufacturing pens and pencils. T & T ceased manufacturing complete pens and pencils in 1970.

11. In 1973 T & T brought an action (hereinafter the T & T–Cross action) against Cross in the United States District Court for the District of Rhode Island (C.A. 5267), in which T & T appealed from the decision of the Trademark Trial and Appeal Board of the United States Patent and Trademark Office upholding Cross's application to register as a trademark a silver-colored top for its writing instruments.

12. On or about August 21, 1974, in the T & T-Cross action, T & T filed Plaintiff's First Request for Admissions, attached to which were specimens of the writing instruments that have been manufactured and sold by Second Quill since on or shortly after September 28, 1972, and requested that Cross admit (*a*) that they did not infringe on any of Cross's rights, including without limitation, Cross's U.S. trademark registration Nos. 543,934; 827,167; and 920,723; or Cross's claimed trademark shown and described in Cross's application serial No. 344,222, filed on or about November 21, 1969; and (*b*) that the manufacture and sale thereof by Second Quill did not constitute unfair competition with Cross.

13. The appearance of the Second Quill writing instruments that were attached to said Plaintiff's First Request for Admissions was substantially similar to that of the writing instruments attached as exhibits C, D, and F to the settlement agreement.

14. By its responses to said Plaintiff's First Request for Admissions, Cross asserted that said writing instruments attached to Plaintiff's First Request for Admissions did infringe on Cross's trademarks and did constitute unfair competition with Cross.

15. Second Quill then, with permission of the court, intervened in the T & T-Cross action and filed its Second Intervener's Complaint, in which it (*a*) asserted, among other things, that the writing instruments manufactured and sold by it since September 28, 1972, as assignee of First Quill's rights under the settlement agreement, are like or similar to the writing instruments attached as exhibits C, D, and F to the settlement agreement and that Cross is estopped from asserting that Second Quill has infringed on any of Cross's purported trademarks or has engaged in unfair competition with Cross by the manufacture and sale of such writing instruments, and (*b*) demanded judgment, among other things,

that its manufacture and sale of such writing instruments do not infringe any of Cross's purported trademarks or constitute unfair competition.

16. By its answer and counterclaim to said Second Intervener's Complaint filed April 7, 1975, Cross (*a*) admitted that it had entered into a written agreement with First Quill on November 29, 1967, "for the terms and legal effect of which, this [c]ourt is respectfully referred to the document," (*b*) denied Second Quill's averments with respect to estoppel, and (*c*) sought (i) an injunction against Second Quill's manufacture and sale of the writing instruments that Second Quill was then manufacturing and selling as aforesaid and (ii) an accounting, on the grounds of both unfair competition and trademark infringement.

17. Following trial before the Honorable Raymond J. Pettine, Chief Judge of the United States District Court for the District of Rhode Island, sitting without a jury, the court held that (1) the Cross trademark was valid, (2) First Quill's writing instruments infringed on the Cross trademark, but (3) Cross was estopped from suing Second Quill for infringement for manufacturing similar writing instruments by virtue of the settlement agreement between Cross and First Quill which had been assigned to Second Quill. The court's opinion may be found in *T & T Manufacturing Co. v. A.T. Cross Co.*, 449 F.Supp. 813 (D.R.I.1978), and is incorporated herein by reference, along with the court's judgment.

18. Cross appealed from the District Court's judgment to the United States Court of Appeals for the First Circuit, which, on November 29, 1978, affirmed said judgment.

19. On February 26, 1979, Cross filed a petition for certiorari with the Supreme Court of the United States for review of the judgment of the Court of Appeals. On April 16, 1979, said petition was denied.

20. Second Quill has reasonably incurred legal expenses in the amount of $67,948.45 and expenses other than legal expenses in the amount of $962.42, for a total of $68,910.87, in connection with the defense of Cross's counterclaim against it. If, on the foregoing facts and the law applicable thereto, Second Quill is entitled to damages against Cross in this action for breach of Cross's promise not to sue First Quill or its successors and assigns for unfair competition or trademark infringement, the amount of such damages is to be $68,910.87, plus interest in the amount of $27,890.12 through December 1, 1981, and $22.70 per day from December 1, 1981, until payment of said sum of $68,910.87.

21. For the purposes of this litigation, it is stipulated that the parties to the various agreements described herein complied with their obligations pursuant to said agreements with the exception of the Cross counterclaim that is the subject matter of this dispute.

I

Plaintiff-Second Quill concedes that Rhode Island law controls our interpretation of the November 29, 1967 settlement agreement. In so doing, it argues that firmly established principles of contract law in Rhode Island should be applied here to award it damages for breach of Cross's covenant not to sue. Specifically, Second Quill contends that the prior holdings of this court in *Greene v. Creighton*, 7 R.I. 1 (1861), and *Point Street Iron Works v. Turner*, 14 R.I. 122 (1883), support a determination in its favor. A close review of these cases, however, demonstrates that neither provides the requisite authority to support our granting the relief prayed for by Second Quill.

In *Greene v. Creighton*, this court adopted the classic English rule that damages for breach of contract

"should be such as may fairly and reasonably be considered either [arising naturally], i.e.[,] according to the usual course of things, from such breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of [both] parties, at the

time they made the contract, as the probable result [of the breach] of it." 7 R.I. at 11 (quoting *Hadley v. Baxendale*, 9 Exch. 341, 354, 156 Eng.Rep. 145, 151 (1854)).

*Greene* did not involve a request for attorneys' fees by a successful litigant as does the case at bar. Rather, it involved a suit by a grantee in fee against the grantor of a certain parcel of real estate to recover damages he sustained as a consequence of the grantor's breach of his covenant against encumbrances. *Id.* at 2–4. Second, in *Greene*, the plaintiff-grantee was only permitted the recovery of one dollar in nominal damages for the defendant's breach. Id. at 12. The plaintiff's request for additional damages was rejected by Chief Justice Ames as totally unwarranted since the special damages requested by the plaintiff had arisen solely as a result of the plaintiff's plans for a special use of the land. The plaintiff had never communicated his plans for a special use of the parcel to the defendant-grantor before the conveyance. The court thus held that his claim for special damages should not be awarded since the special use of the land was not within the objective contemplation of both parties at the time of the conveyance.[1] *Id.* at 10–12.

In *Point Street Iron Works v. Turner*, 14 R.I. 122 (1883), this court was again faced with a situation in which a grantor of real estate had breached a covenant of good title that had been conveyed in a full warranty deed to the grantees. After the grantees had been evicted by the holder of paramount title, they sued the executor of the grantor for the costs of defending the ejectment proceeding. In a per curiam opinion, this court held that in cases in which (1) a grantor had been notified of an ejectment suit brought against his grantee, (2) the grantor did not notify the grantee of his desire to make no defense to the action, and (3) the grantee has incurred reasonable

counsel fees in defending the title, the grantee is entitled to an award of these fees. *Id.* at 123.

Initially, it is beyond doubt that there was no covenant not to sue at issue in *Point Street*. Indeed, in *Point Street* the issue to be resolved did not even involve a question of contractual interpretation, but rather dealt solely with a narrow question of property law. Secondly, and more importantly, our research reveals that *Point Street* has never been interpreted as a contracts case or cited as authority to support an award of attorneys' fees. If it had, it would clearly have been an aberration in our body of law dealing with the right to counsel fees.

■ The general rule in Rhode Island governing the recoverability of attorneys' fees is that absent specific statutory authority or contractual liability therefor, counsel fees may not be taxed as part of the costs of litigation. *R.A. Beaufort & Sons, Inc. v. Trivisonno*, 121 R.I. 835, 843, 403 A.2d 664, 668 (1979); *Malinou v. Rhode Island Hospital Trust National Bank*, 116 R.I. 548, 550–51, 359 A.2d 43, 44 (1976); *Washington Trust Co. v. Fatone*, 106 R.I. 168, 172, 256 A.2d 490, 493 (1969).

■ There is no statute that exists to impose liability upon Cross for Second Quill's claim. The question of Cross's liability for Second Quill's legal expenses is therefore solely one of contractual liability. In its essence, this determination must be made by examining what was within the contemplation of First Quill and Cross at the time that they executed the 1967 settlement agreement. *George v. George F. Berkander, Inc.*, 92 R.I. 426, 431, 169 A.2d 370, 372 (1961); *Greene v. Creighton*, 7 R.I. at 11. Succinctly, was Cross's execution of its covenant not to sue First Quill in 1967 a demonstration of its objective assent to be liable for the litigation expenses incurred by First Quill's assignee in defend-

---

**1.** As our factual discussion below will demonstrate, we are convinced that a similar lack of objective assent existed upon the part of Cross in its execution of the November 1967 settlement agreement so as not to render it liable for Second Quill's counsel fees.

ing against a counterclaim brought by Cross?

It is our opinion that the guiding principles for a correct resolution of this matter were announced by the United States Court of Appeals for the Second Circuit. In *Artvale, Inc. v. Rugby Fabrics Corp.*, 363 F.2d 1002 (2d Cir.1966), it was held that the question of the entitlement to attorneys' fees for breach of a covenant not to sue was

> "to be solved not by invoking an abstract rule of law but by seeking to determine what the parties fairly contemplated, or would have had they addressed their minds to the problem. Certainly it is not beyond the powers of a lawyer to draw a covenant not to sue in such terms as to make clear that any breach will entail liability for damages, including the most certain of all—defendant's litigation expense. Yet to distill all this out of the usual formal covenant would be going too far; its primary function is to serve as a shield rather than as a sword, often being employed instead of a release to avoid the common law rule with respect to the effect of a release on joint tort-feasors. In the absence of contrary evidence, sufficient effect is given the usual covenant not to sue if, in addition to its service as a defense, it is read as imposing liability only for suits brought in obvious breach or otherwise in bad faith—clearly not the situation here." 363 F.2d at 1008.

Reviewing the record, we find no facts or circumstances that would support our finding of the existence of an obvious breach of Cross's covenant not to sue. This covenant was initially assigned by First Quill to T & T and then subsequently assigned by T & T to its newly incorporated wholly owned subsidiary. It was a close question of law whether or not the 1967 settlement agreement between Cross and First Quill could be assigned at all by First Quill. *See T & T Manufacturing Co. v. A.T. Cross Co.*, 449 F.Supp. 813, 823 (D.R.I.1978).

The legal validity of the subsequent assignment from T & T to Second Quill was subject to the same degree of uncertainty as the initial assignment. The mere fact that the 1967 settlement agreement was assigned therefore removed Cross's action of filing a counterclaim from the realm of obvious breach. The legal validity of these assignments was not obvious to the Federal District Court of Rhode Island nor is it to this court. Under these circumstances we will not impart to Cross a clairvoyant awareness of an impending development of the common law.

Since we find no obvious breach by Cross of its covenant not to sue, Second Quill may only recover upon a showing that Cross's counterclaim was filed in bad faith. It has been said that the "bad faith" that justifies an award of attorneys' "fees may be demonstrated by showing that a defendant's obstinacy in granting a plaintiff his clear legal rights necessitated resort to legal action with all the expense and delay entailed in litigation." *Huecker v. Milburn*, 538 F.2d 1241, 1245 n. 9 (6th Cir. 1976). A claim is not made in "bad faith" so as to shift the burden of costs as long as the claim has some legal and factual basis when considered in light of the reasonable belief of the individual making the claim. *Nemeroff v. Abelson*, 620 F.2d 339, 348 (2d Cir.1980); *In re Melting Moments, Inc.*, 21 B.R. 173, 175 (S.D.N.Y.1982).

In the first place, obstinacy can hardly be attributed to the conduct of defendant-Cross in denying the applicability of its covenant not to sue to the counterclaim it filed. Cross's argument that federal trademark (and not Rhode Island) law controlled the assignability of the 1967 settlement agreement was not frivolous, nor can it be considered a consequence of its own obdurate conduct. Furthermore, Second Quill's legal right to be immune from suit for trademark infringement and unfair business competition was not so clear as to be summarily vindicated by the Federal District Court. As noted above, this was a close question. In light of this fact, it

would be error to conclude that Second Quill's contractual right to be free from suit was so clear as to render Cross liable for Second Quill's legal expenses in defending against Cross's counterclaim.

█ Finally, we are convinced that Cross possessed a sufficient basis for bringing this counterclaim. It was not unreasonable for Cross to believe that it had "some legal and factual basis" to support its right to bring this counterclaim. Cross was not the aggressor in this dispute. It did not file the original cause of action—that action was taken by T & T. Cross was subsequently sued by Second Quill as an intervening party. Under these circumstances, Cross was entitled to employ any and all legal defenses it reasonably believed it possessed. This counterclaim represented just such a defense, for in the context of litigation, an attorney for a party must resolve all legal doubts in favor of his client. We are of the opinion therefore that Second Quill's request for attorneys' fees should be denied because of its inability to prove the requisite bad faith on the part of Cross in breaching its covenant not to sue. *See Borbely v. Nationwide Mutual Insurance Co.,* 547 F.Supp. 959, 980–81 (D.N.J.1981).

For the reasons stated, the question certified to us is answered in the negative, and the case is remanded to the Superior Court.