DECISION
This matter is before the Court on five pre-trial motions:
 1. Bank of America and TriSail Capital Corporation's (formerly Fleet National Bank and Fleet Real Estate, Inc.) ("the Bank") Motion for Summary Judgment;
 2. The Parking Company L.P.'s ("TPC") Cross Motion for Partial Summary Judgment;
 3. Rhode Island Airport Corporation's ("RIAC") Motion to Reopen Discovery;
 4. The Bank's Motion for Sanctions;
 5. TPC and New England Parking Company's ("NEP") Motion for Sanctions. *Page 2 
 FACTS
The facts underlying the claims, counterclaims, and third-party claims in this action and in related condemnation proceedings have been set forth in some detail in previous appellate decisions, and need not be exhaustively reiterated herein. See Rhode Island Economic DevelopmentCorp. v. The Parking Co. ("RIEDC I"), 892 A.2d 87, 107 (R.I. 2006);Rhode Island Economic Development Corp. v. The Parking Co. ("RIEDCII"), 909 A.2d 943 (R.I. 2006). The facts more pertinent to the motions currently before the Court are as follows.
TPC and RIAC entered into a Concession and Lease Agreement ("CLA"). The CLA and its amendments are designed to comprehensively govern the relationship between RIAC and TPC, which operates various parking facilities at T.F. Green Airport. Among those facilities is an indoor parking garage known as Garage B. The CLA includes the following provision: "No cancellation, surrender, amendment or modification of the terms of this Agreement shall be effective without the prior written consent of the Lender." CLA, Article XXVII(B)(1). The Bank is TPC's lender which provided financing to TPC for the operation of Garage B and for other parking-related improvements. The Bank currently has three outstanding loans to TPC and its affiliated entity, NEP. The parties have agreed that the Bank is a "Lender" as that term is used in the CLA.
During the pendency of the CLA, and during a time when TPC was to have the exclusive right to operate Garage B, the Rhode Island Economic Development Corporation ("EDC"), at the behest of its wholly-owned subsidiary, RIAC, initiated a "quick take" condemnation action, condemning a temporary easement in Garage B, thus giving it exclusive possession and control of Garage B through November 29, 2007. The R.I. Supreme Court ruled that this condemnation was not for a public use/purpose and declared it null and void. RIEDC I, 892 A.2d at 107. *Page 3 
In the wake of that decision, the Bank relies on the aforementioned CLA cancellation/surrender provision (Article XXVII(B)(1)) to argue that RIAC failed to obtain its consent before initiating its purported condemnation action, and that such failure amounted to a breach of the contract between RIAC and TPC. The Bank has moved for summary judgment on that issue.
Also, in light of the R.I. Supreme Court's determination that the purported condemnation was wrongful, TPC has moved for partial summary judgment as to Count II of the Amended Complaint regarding RIAC's alleged breach of TPC's covenant of quiet enjoyment, which it argues is contained in Article XX of the CLA. Article XX provides that TPC "shall peacefully have and enjoy the Surface Parking Lots and the rights, privileges, and facilities granted by this agreement."
The Motion to Reopen Discovery focuses on whether RIAC should be permitted to discover from the Bank, NEP and TPC the manner by which TPC allocated and used the proceeds of the $4.56 million judgment received in the condemnation case.
The motions for sanctions filed by the Bank, TPC and NEP seek to impose sanctions on RIAC relative to the positions it has taken with respect to the aforementioned motions.
 ANALYSIS
The Bank's Breach of Contract Claim
The Bank's breach of contract claim stems from RIAC's wrongful condemnation action. In its analysis of RIAC's attempted condemnation of Garage B, the R.I. Supreme Court characterized RIAC's behavior as an "arbitrary and bad-faith taking." RIEDC I, 892 A.2d at 106. The Court also referred to RIAC's condemnation action as an attempt to "gain control of Garage B at a discounted price." Id. at 107. In its criticism of RIAC, the Court described the *Page 4 
duty RIAC owed TPC as one of "good faith and fair dealing."Id. at 105. The Bank argues that the Supreme Court's characterization of RIAC's actions in RIEDC I represent the "law of the case" and are binding on this Court when addressing the Bank's breach of contract claim.
Article XXVII(B)(1) was intended to protect the Bank as a third-party beneficiary. RIAC's unilateral decision to pursue a condemnation action, according to the Supreme Court, represented an attempt by RIAC to obtain a favorable modification of the agreement by way of an unlawful condemnation when it was unable to obtain those modifications at the bargaining table.
Both RIEDC I and the decision that followed in RIEDC II provide controlling language relative to the issue of whether the actions of RIAC, or its parent EDC, resulted in a "cancellation, surrender, amendment or modification" of the CLA requiring prior written consent of the lender. In RIEDC I, the Court characterized the motivation of both EDC and RIAC: "Thus, we are of the opinion that EDC's motivation in this case was to increase revenue and not create additional airport parking."RIEDC I, 892 A.2d at 106. That language refers specifically to "changes" to the CLA that "were obtained" by RIAC as a result of the unlawful condemnation. In light of that language, this Court would be hard-pressed to characterize the actions of EDC or RIAC as anything other than effectuating a "modification" of the terms of the CLA as that word is used in Article XXVII(B)(1).
Furthermore, in RIEDC II, the Court characterized the purported condemnation as a "ruse" to allow RIAC to "avoid the contract between the parties through an unconstitutional exercise of Rhode Island Economic Development Corporation's (EDC's) eminent domain authority."RIEDC II, 909 A.2d at 943. Thus, the Court ordered that Garage B be returned to TPC, and that "its contract rights be restored as of the date of the purported taking." Id. *Page 5 
(emphasis added). Once again, the language of the Supreme Court indicates that a change, amendment or modification of the contract had resulted from the purported condemnation, thus requiring a "restoration" of TPC's contract rights.[1] Therefore, in light of the undisputed facts and the previous rulings of the Supreme Court, this Court finds as a matter of law that the actions of RIAC, acting through its parent EDC, resulted in a modification of the CLA for which the prior written consent of the lender had not been obtained. Accordingly, RIAC breached the lender's rights clause of the CLA, and the Bank is entitled to summary judgment as to that claim.
As a result of that breach, the Bank also has moved this Court to determine that it is entitled to attorney's fees and costs associated with its defense of the condemnation action, as well as to its prosecution of the within claim for breach of contract in this action.[2] Having determined that RIAC has breached the lender's rights clause of the CLA, this Court further concludes that reasonable costs and attorneys' fees associated with the Bank's defense of the condemnation action are appropriate damages to which the Bank is entitled.[3]
Basic principles of contract law entitle the Bank to be compensated by way of damages in this case for its reasonable costs and attorneys' fees in its defense of the condemnation claim. The overwhelming authority cited to the Court supports the proposition that when a breach of contract results in a third-party claim, the litigation costs associated with the defense of that claim may be recoverable against the breaching party as damages. See Restatement (Second) of Contracts § 351 cmt. c (1981). ("Sometimes a breach of contract results in claims by third *Page 6 
persons against the injured party. The party in breach is liable for the amount of any judgment against the injured party together with his reasonable expenditures in the litigation, if the party in breach had reason to foresee such expenditures as the probable result of his breach at the time he made the contract."). However, a distinction must be drawn between attorney's fees awarded as costs to the prevailing party in civil litigation, an award that is generally not permitted, versus attorney's fees incurred as an element of damages for breach of contract. In fact, the very cases cited to the Court by the Bank in support of its claim for attorney's fees make this very distinction. Litigation costs necessarily and forseeably incurred in related litigation with third parties brought about by a breach of contract may be recoverable as damages for breach of contract. See Ingersoll v.Milling Mach. Co. v. M/V Bodena, 829 F.2d 293, 309-310 (2nd Cir. 1987);see also Ranger Const. Co. v. Prince William County, 605 F.2d 1298,1301-02 (4th Cir. 1979). In each of these cases, the Court made a distinction between litigation expenses incurred in collateral litigation awarded as damages for breach of contract as opposed to costs associated with litigation between contracting parties to establish the breach of contract. For instance, a party may be entitled to litigation costs as damages against an indemnitor resulting from having to defend a claim for which an indemnification obligation was breached, yet not be entitled to attorney's fees awarded as costs to the prevailing party in the litigation as between the indemnitor and indemnitee to establish the breach itself. Ranger Const Co., 605 F.2d at 1304-05. While the attorney's fees in the condemnation case represent the damages to the Bank for RIAC's breach of contract, the entitlement to such fees and costs in this action is more problematic. It might be said that, as a result of EDC's condemnation, the Bank was obliged to vindicate its rights by pursuing this claim against RIAC for breach of contract. However, without a statutory or contractual right to recover costs and fees, the prevailing party in contract *Page 7 
litigation is generally not entitled to recover such costs. The R.I. Supreme Court "has long held that attorney's fees may not be awarded as a separate item of damages absent contractual or statutory authorization." Farrell v. Garden City Builders, 477 A.2d 81, 81-82
(R.I. 1984). The Bank chose to join this litigation by way of intervention, yet the vindication of its rights relative to the condemnation actually resulted from its successful defense and appellate advocacy in the related Kent County condemnation case. The Bank attempts to support its claim to attorneys' fees in this case by analogizing its claim to one of a breach of a covenant not to sue, suggesting that litigation costs are a proper measure of damages in such a claim.See Quill Co. v. A.T. Cross Co., 477 A.2d 939, 944 (R.I. 1984). The discussion in Quill, however, is similar to that in the federal cases cited above, allowing as damages certain litigation costs associated with collateral litigation occasioned by a breach of contract, but otherwise not departing from the basic American rule with regard to attorney's fees. The prevailing parties' litigation costs are always the consequence of the successful conclusion of breach of contract litigation. Yet the general "American rule" — long recognized in Rhode Island — prohibits the prevailing party from collecting attorneys' fees absent a contractual or statutory basis therefore.
There is no provision in the CLA for the award of attorneys' fees to the Bank by reason of RIAC's breach of Article XXVII(B)(1). As to a statutory basis, the only provision that might apply is R.I.G.L. (1956) § 9-1-45, entitled "Attorney's fees in breach of contract actions," which provides: "The court may award a reasonable attorney's fee to the prevailing party in any civil action arising from a breach of contract in which the court: (1) Finds that there was a complete absence of a justiciable issue of either law or fact raised by the losing party; or (2) Renders a default judgment against the losing party."[4] *Page 8 
The underlying merits of the Bank's claims of breach of contract, and RIAC's defenses thereto, were far from one-sided. In fact, counsel for all sides have submitted well-crafted and thoughtful arguments, both orally and in writing, relative to the Bank's claim of breach. Although ultimately this Court finds the Bank's arguments more compelling, the Court cannot say that RIAC's positions in defending against the Bank's breach of contract claim evidenced a "complete absence of a justiciable issue of either law or fact." Thus, the lone statutory basis for attorneys' fees in this action is inapplicable.
For the foregoing reasons, this Court will grant summary judgment to the Bank on its claim of breach of contract and, as a consequence thereof, finds that the Bank is entitled to damages from RIAC as a result of the reasonable litigation costs incurred in its defense and appellate review of the issues in KM04-0665 (the condemnation case). The amount of those damages must await further proceedings, as it involves disputed issues of fact, and is not amenable to summary disposition.[5]
TPC's Breach of the Covenant of Quiet Enjoyment Claim
Article XX of the CLA provides that TPC "shall peacefully have and enjoy the Surface Parking Lots and the rights, privileges, and facilities granted by this Agreement." By way of TPC's cross motion for partial summary judgment, TPC argues that the clear language of Article XX extends to all of TPC's rights, privileges, and facilities granted to TPC under the CLA, and is not merely limited to those associated with the Surface Parking Lots.[6] Among the rights and privileges granted to TPC under the CLA was the "exclusive right to construct, operate and *Page 9 
maintain" Garage B and the walkway "to serve the airport," as well as other rights and privileges set forth in TPC's supporting memorandum, including a covenant that RIAC would not allow or operate a competing facility on its airport property. TPC's Mem., Feb. 20, 2007 at 4-5.
RIAC, in opposing partial summary judgment, emphasizes the unique nature of the CLA and characterizes itself as the tenant, in that during the term of the CLA, TPC is the legal owner of Garage B. TPC, on the other hand, argues that it is the "tenant" by reason of RIAC being the "equitable owner" of Garage B in that RIAC has a right to legal title to the garage, without any further payments, at the conclusion of the lease term. In addition, TPC points to the CLA's use of the terms "rents" and "rental payments" in describing the fees payable from TPC to RIAC during the term of the lease.
The Court, however, finds the debate over which party is the landlord and which is the tenant not germane to the consideration of the substance of TPC's motion. It is beyond question that TPC is entitled to certain "rights, privileges, and facilities" under the CLA. Accordingly, any material interference with those rights can and should be considered a violation of the terms of Article XX, regardless of traditional labels pertinent to commercial leasing.
As the Supreme Court indicated in RIEDC I, "with the assistance of the EDC condemnation statute, RIAC gained possession and control of Garage B . . . and RIAC ousted TPC, to whom it owed a duty of good faith and fair dealing, and obtained all of the beneficial use of Garage B." RIEDCI, 892 A.2d at 105 (emphases added). There is no question that whatever rights TPC had to peacefully have and enjoy the benefits it had acquired in Garage B during the term of the CLA were disrupted by the actions of RIAC. Garage B is a "facility" within the meaning of Article XX, and TPC's operating rights are clearly "rights" and "privileges" granted *Page 10 
to TPC under the CLA. The actions of RIAC, therefore, resulted in a breach of Article XX of the CLA.[7]
Accordingly, TPC is entitled to summary judgment as to RIAC's liability for the breach of Article XX of the CLA (Count II of the Amended Complaint). As with the earlier ruling regarding the Bank's claim, determination of the amount of damages suffered as a result of the breach is left for further proceedings.[8]
RIAC's Motion to Reopen Discovery
Discovery in this matter closed in December of 2005. Notwithstanding such closure, RIAC wishes to reopen discovery in a limited fashion to permit discovery as to the use and allocation of the settlement proceeds which TPC was awarded by way of judgment in the condemnation case. In particular, RIAC argues that the disposition of the judgment proceeds may have some relevancy to the claims of NEP in connection with losses it is alleged to have incurred as a result of the condemnation of Garage B, and whether NEP would be the beneficiary of a double recovery were RIAC required to pay those losses a second time.[9] RIAC also argues that the discovery of the disposition of the judgment proceeds may be relevant at trial to *Page 11 
questions concerning the "alter-ego" relationship between TPC and its wholly-owned subsidiary, NEP.
The Bank, TPC and NEP object to this limited additional discovery, arguing that any evidence gleaned as a result of inquiry into the use and allocation of the judgment in favor of TPC would unduly delay these proceedings and be barred under concepts of judicial estoppel and law of the case.
The Court believes that a limited reopener of discovery to allow focused inquiry into the disposition and allocation of the judgment proceeds will not unduly delay trial. This may be accomplished either by way of new discovery or supplemental responses to existing discovery. This case is complicated business litigation related to a condemnation matter that has been the subject of review by the Supreme Court twice since its inception. It seems that discovery of the disposition of the judgment funds in the condemnation case may be relevant to the issue of the relationship between the two entities and whether all or any part of the condemnation judgment is duplicative of any claims asserted either by TPC or NEP in this case. Furthermore, to the extent that the issue of NEP's damage is subject to exploration at this time, such exploration should occur because, since the filing of this lawsuit, payments have been made to satisfy a judgment entered in a related case, which judgment did not even exist until some three years after this lawsuit was filed.
As to law of the case, this Court has never ruled on the issue of alter ego relating to the merits of the claims of tortious interference and trade secret violations asserted by RIAC in its third-party complaint.[10] Factual statements made by the Court in connection with motions to *Page 12 
dismiss are not binding on the Court at the time of trial on the merits. As to judicial estoppel, Rule 8(e)(2) allows parties to plead alternative theories of recovery or alternative defenses and such theories and defenses need not be consistent. See DiLuglio v. ProvidenceAuto Body, Inc., 755 A.2d 757, 777 (R.I. 2000) (stating that Rule 8(e)(2) allows for the "assertion of alternative and hypothetical claims and defenses"). Furthermore, the doctrine of judicial estoppel should be applied cautiously to avoid injustice. Greenwich Bay Yacht Basic Assocs.v. Brown, 537 A.2d 988, 993 (R.I. 1988). This Court does not conclude that the discovery requested should be barred at this time by reference to that doctrine.
RIAC's motion to reopen discovery is thus granted.[11] The Court is not ruling in the context of a motion to reopen discovery whether the positions relative to alter ego or double recovery articulated by RIAC are applicable in this case. Both theories are fact intensive, and the facts have not yet come to light in order to properly address these theories.
Sanctions Motions
The Court has carefully reviewed the motions for sanctions filed by the Bank and TPC/NEP. The Court has in fact granted RIAC's motion for the limited reopening of discovery. Accordingly, a Rule 11 motion suggesting that such a motion was "frivolous" is unconvincing.
In addition, the Bank has filed a motion arguing that RIAC's opposition to the Bank's motion for summary judgment should be subject to Rule 11 sanctions. For the reasons stated relative to the inapplicability of R.I.G.L. (1956) § 9-1-45, the Court rules that an award of *Page 13 
sanctions for RIAC's opposition to the Bank's motion for summary judgment is equally undeserving.
 CONCLUSION
The parties shall submit a form of order reflecting the Court's rulings on each of the pretrial motions addressed in this decision.
[1] The bulk of RIAC's arguments focus on the inapplicability of Article XXVII(B)(1) because a condemnation is neither a cancellation, surrender, amendment nor modification of the agreement. Although it may be valid that the Bank's permission would not be necessary in advance of a lawful condemnation that issue has been obviated by the Supreme Court's rulings. The Supreme Court has made it abundantly clear that the actions of EDC and RIAC fall far afield from a legitimate use of the condemnation authority granted by statute to EDC.
[2] In light of disputed fact issues, the Bank concedes that summary judgment as to a specific dollar amount is inappropriate without further proceedings.
[3] Apparently, the Bank concedes that because its collateral (Garage B) has been restored to its borrower (TPC), no damages due to impairment of the collateral would be appropriate.
[4] Interestingly, neither the Bank nor RIAC has raised an issue concerning the applicability of this statutory basis for attorneys' fees.
[5] A question has been raised as to the preclusive effect of the Consent Judgment entered in KM04-0665. Although the drafting of both the Consent Judgment and the document entitled "Satisfaction of Judgment" might have been made with greater precision relative to the Bank's preservation of its claim of damages in this case, the Court is satisfied that nothing in those documents resulted in a waiver of the Bank's claim of litigation costs incurred in the Kent County case as an element of damages against RIAC, as asserted in this proceeding.
[6] It is undisputed that Garage B is not a "Surface Parking Lot" as that phrase is defined elsewhere in the CLA.
[7] RIAC also argues that Article XX is limited to TPC's rights in the surface parking lots. A court interpreting a contract has an obligation to give the words contained therein their plain and ordinary meaning and glean the intent of the parties from the words chosen. Malo v. AetnaCasualty Sur. Co., 459 A.2d 954, 956 (R.I. 1983). The use of the word "and" before the clause pertaining to the "rights, privileges and facilities granted by this agreement" is clear in its meaning that the covenants contained in the Article are generally applicable, rather than limited to a particular facility. In fact, the use of the word "facilities" would be surplusage if the limiting interpretation urged by RIAC were accepted. See Providence Journal Co. v. Providence NewspaperGuild, 271 F.3d 16, 21 (1st Cir. 2001) (courts should avoid a construction that renders a contract term meaningless).
[8] Article XX includes an indemnification and hold harmless provision requiring reimbursement for any costs, expenses, loss, and damage, including reasonable attorney's fees, resulting from a breach of the covenants contained in Article XX. Contrary to the discussionsupra with regard to the Bank's claim and the distinction between attorney's fees incurred in this litigation versus the condemnation litigation, the inclusion of the contractual provision as to attorneys' fees affords TPC a claim for litigation expense, including reasonable attorneys' fees, incurred in both this case as well as the condemnation case.
[9] For instance, NEP has asserted by way of counterclaims that it lost revenue it would otherwise have earned at Garage C by virtue of parking traffic diverted from Garage C during the period that RIAC was wrongfully in possession and control of Garage B.
[10] Early in these proceedings, this Court addressed a variety of Rule 12(b)(6) and Rule 12(c) motions as to both claims and counterclaims asserted herein. A denial of a motion to dismiss, however, does not constitute a ruling on the merits of the claim(s) in dispute.Narragansett Elec. Lighting Co. v. Sabre, 53 R.I. 98, 100, 164 A. 324
(1933). Certainly, the Court's recitation of facts alleged in the Complaint for purposes of setting the factual context in which to decide motions addressed to the pleadings (that NEP is a separate limited partnership closely affiliated with TPC) is a far cry from a negative determination by the Court on the merits of whether NEP is the "alter-ego" of TPC for purposes of considering issues of duplicate recovery.
[11] Because this case has now gone beyond its three year anniversary, it is important that the matter be advanced expeditiously to trial. Accordingly, RIAC shall submit to the Court within ten (10) days from the date of this decision a proposed discovery schedule setting forth the issues subject to reopener, either by way of supplemental responses or new discovery. The submission should be aimed at an expeditious conclusion of limited written discovery, and no more than one Rule 30(b)(6) designation deposition from each of the opposing parties. All discovery proposed shall be completed within the next sixty (60) days.